Arnold ESCOBAR, Plaintiff-Appellant,

v.

The SS WASHINGTON TRADER, her engines, tackle, apparel, etc., et al., Defendant-Appellee.

Arnold ESCOBAR, Plaintiff-Appellee,

v.

The SS WASHINGTON TRADER, her engines, tackle, apparel, etc., et al., Defendant-Appellant.

Nos. 72–2944, 72–2995.

United States Court of Appeals, Ninth Circuit.

June 5, 1974.

Eric J. Schmidt (argued), San Francisco, Cal., for appellant cross appellee.

Frederick W. Wentker (argued), Gary P. Snyder of Lillick, McHose, Wheat, Adams & Charles, San Francisco, Cal., for appellee cross appellant.

Before CHAMBERS and TRASK, Circuit Judges, and SHARP,* District Judge.

Chambers, Circuit Judge, filed a concurring opinion.

* Honorable Morell E. Sharp, United States District Judge from the Western District of Washington, sitting by designation.

PER CURIAM:

Seaman Arnold Escobar and the SS Washington Trader et al. (Shipowner) cross appeal from a judgment which awarded Escobar limited double wage recovery pursuant to 46 U.S.C. § 596,[1] but ruled in favor of the Shipowner on its counterclaim for repatriation and medical costs paid by it on behalf of the seaman. In light of this court's recent holding in Matise v. American Foreign Steamship Co., 488 F.2d 469 (9th Cir., 1974), we reverse in part and remand for a recomputation of the double wage penalty.

The facts relevant to this appeal are as follows: On March 5, 1969, Escobar was discharged as a wiper aboard the SS Washington Trader and ordered removed from the vessel following an incident which occurred while the ship was tied up at Subic Bay, Philippine Islands. While descending the gangplank under police escort, Escobar fell and suffered a minor back injury. He was taken to a local United States naval hospital and remained there for treatment until March 10, 1969. Upon discharge from the hospital, Escobar was taken to Manila where he formally demanded his wages from an agent of the Shipowner. The agent initiated radio contacts between the company's New York office and the SS Washington Trader (which was then out at sea) but no payment was made. Meanwhile, Escobar encountered difficulties with Philippine immigration officials because of his alien status and was taken into custody. Upon the intercession of the United States consul in Manila, the Shipowner agreed to pay Escobar's air fare to San Francisco and Philippine expenses if Escobar signed a guarantee to reimburse the Shipowner for all the repatriation costs. Escobar signed the agent's "Acknowledgement Certificate" to that effect and was flown to San Francisco on March 13, 1969. He was not, however, paid until April 4, 1969, and from his final wages of $883.04 the Shipowner deducted $536.72 representing repatriation costs. Escobar brought suit against the Shipowner in June 1970 challenging the legality of the wage deduction and asserting other claims arising out of the discharge not relevant to this appeal. On September 14, 1970, the Shipowner, upon the advice of counsel, tendered a cash payment of the disputed $536.72 to Escobar while expressly reserving its rights to the contested sum.

The District Court found that Escobar was discharged for good cause and the Shipowner was not responsible for Escobar's hospitalization and repatriation expenses following discharge. The court characterized the Shipowner's payment of repatriation expenses as a payment of wages "in kind" and concluded that the $536.72 wage deduction made on April 4, 1969, was proper. Escobar was accordingly ordered to refund the $536.72 he subsequently received in cash and to pay an additional $245 to the Shipowner representing unreimbursed medical expenses. However, the court also found that the Shipowner's delay in paying Escobar's wages was "without sufficient cause" and therefore subject to a 21-day wage penalty pursuant to section 596.[2]

1. 46 U.S.C. § 596 reads, in pertinent part:
    "The master or owner of any vessel [making foreign voyages] . . . shall pay to every seaman his wages . . . within twenty-four hours after the cargo has been discharged, or within four days after the seaman has been discharged, whichever first happens . . . . Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable as wages in any claim made before the court . . . ."

2. Without any explanation, the District Court found that the Shipowner had sufficient cause for nonpayment of wages during Escobar's hospitalization period from March 5, 1969 to March 10, 1969. The court accordingly assessed double wage penalties beginning on March 14, 1969, (four days after Escobar's discharge from the naval hospital) and running through April 4, 1969.

Both parties appeal from the above judgment.

■ Preliminarily, we affirm the District Court's finding that the Shipowner was entitled to reimbursement for the repatriation and medical expenses it incurred on Escobar's behalf following the seaman's discharge for cause. However, this determination does not affect the central issue on this appeal: namely, the legality and consequences of the Shipowner's deduction of these costs from Escobar's wages. Congress has extensively regulated the types of deductions and set-offs which may be made from a seaman's wages, and the shipowner's mere right to recovery from the seaman will not legalize a deduction that is not recognized by the statutory scheme. Isbrandtsen v. Johnson, 343 U.S. 779, 72 S.Ct. 1011, 96 L.Ed. 1294 (1952). It is therefore necessary to determine whether the Shipowner's deduction of repatriation costs was proper here, and if not, whether the withholding of that portion of the seaman's wages is subject to a section 596 penalty. We believe that the answer to both these questions is circumscribed by Matise v. American Foreign Steamship Co., 488 F. 2d 469, (9th Cir., 1974). In that case the plaintiff seaman, as here, was discharged for cause in a foreign port. The shipowner purchased an air ticket for the seaman, deducted the fare from the seaman's wages and tendered a voucher for the remainder of the wages. In order to actually collect the wages in San Francisco, the seaman was required to sign a written release. In finding that the air fare deduction constituted an unlawful withholding of Matise's wages, this court stated: "The statutory scheme enacted by Congress does not provide for set-offs or deductions for return transportation expenses, and Isbrandtsen has been applied to bar the deduction of repatriation costs from a seaman's wages." Id. at 472; accord, Schwark v. SS Rio Macareo, 249 F.Supp. 375 (E.D.La.1966); see also Swain v. Isthmian Lines, Inc., 360 F.2d 81 (3d Cir. 1966); 1 Norris, Law of Seamen,

§ 355 (3d ed. 1970). Moreover, in Matise this court explicitly rejected the argument successfully advanced below that the shipowner's purchase of the plane ticket and assumption of expenses constituted a payment of wages "in kind":

"Although the appellee contends that the transportation money spent on Matise's alleged behalf is the equivalent to the payment of wages to Matise, the applicable statutes explicitly and unequivocally provide that the wages due are to be paid to the seaman, 46 U.S.C. §§ 596–97. Furthermore, the shipowner here was acting to some extent in its own behalf, in view of its legal obligation to remove all persons, including a discharged seaman such as Matise, whom it had transported to South Vietnam. Even, however, had the money been spent entirely for the benefit of Matise, it could not be treated as a partial payment of his wages and thereby deducted from the total amount of wages that he had earned and to which he was entitled." 488 F. 2d at 471.

■ We are therefore compelled to follow the above interpretation of 46 U.S.C. § 596 and Isbrandtsen, supra, and conclude that the deduction of repatriation costs from Escobar's wages was improper.

Turning next to the question of whether this deduction constituted a withholding of wages "without sufficient cause" under section 596, we are again bound by the reasoning of Matise, supra. The court there rejected the shipowner's arguments that uncertainty as to the legality of the deduction and reliance on the seaman's written release each provided sufficient grounds to remove the withholding from the operation of the penalty statute. With regard to the former justification the court stated:

" . . . [T]he case law has, for at least two decades, provided full notice to shipowners seeking to avoid the imposition of double wage penalties that

274

only those deductions from wages that are allowed by statute are lawful. As the court remarked in Swain v. Isthmian Lines, Inc., *supra:* 'It has been eminently clear in the law, at the very least since the Supreme Court case of Isbrandtsen Co. v. Johnson in 1952 that a deduction from wages for medical expenses such as were incurred by appellee in the instant case is wrongful as falling outside the proper deductible instances . . . . This question, therefore has been closed for some time.' 360 F.2d, at 83 (footnote omitted).

"It is therefore clear that the shipowner in our case cannot claim that it had 'sufficient cause' to withhold a portion of Matise's wages because of reliance on the general maritime law which did not require a shipowner to pay the cost of repatriating a seaman discharged for good cause. As we have previously indicated, that argument has been without merit since the Supreme Court decided Isbrandtsen v. Johnson, *supra,* over twenty years ago." 488 F.2d at 473.

*Accord,* 1 Norris, *supra* § 392. The court also found that because execution of the written release was an express precondition to receipt of wages, the seaman was economically compelled to sign the document. Under these circumstances the court concluded that the shipowner was not justified in relying upon the release it coerced as a "sufficient cause" for withholding Matise's wages. Although the "Acknowledgement Certificate" signed by Escobar was not explicitly a precondition to the payment of wages, we do not feel that

this technical difference justifies a conclusion contrary to *Matise.* In the instant case the Shipowner demanded the guarantee from Escobar during the period in which it was unlawfully withholding the seaman's wages. Moreover, this withholding left Escobar, an illegal alien, stranded in the Philippines without funds. In short, these were the very circumstances which prompted Congressional enactment of much of the protective legislation for seamen and section 596 in particular. *See e. g.,* Ladzinski v. Sperling and Trading Corp., 300 F. Supp. 947, 954–955 (S.D.N.Y.1969).

■ We conclude therefore that the Shipowner improperly deducted repatriation costs from Escobar's wages and that this action constituted an unlawful withholding subject to the section 596 double wage penalty. The only remaining issue is the designation of the penalty period itself. Despite our concern for a possibly inequitable windfall recovery to the seaman, we agree with the Third Circuit that the language of section 596 is unequivocal and mandatory. Swain v. Isthmian Lines, Inc., 360 F.2d 81, 84–88, (3d Cir. 1966).[3]

We accordingly reverse in part and remand for further consideration in the light of this opinion.

CHAMBERS, Circuit Judge (concurring):

While I concur in the foregoing, the result is horrible. I am not concerned with the policy of double wage recovery generally. But the statute in this type of case results in a taking which is unconscionable. The Congress should do something about it.

3. The contrary view would assess the amount of section 596 penalty by considering "the equities of a particular case," Prindes v. SS African Pilgrim, 266 F.2d 125, 128 (4th Cir. 1959). *See also,* Southern Cross SS Co. v. Firipis, 285 F.2d 651 (4th Cir. 1960), cert. denied, 365 U.S. 869, 81 S.Ct. 903, 5 L.Ed.2d 859; Kontos v. SS Sophie, 236 F.Supp. 664 (D.C.Pa.1964). We find no support for a discretionary assessment of the double wage penalty in the present language of section 596 and find the reasoning in Swain, *supra,* persuasive.