Arnold ESCOBAR, Plaintiff-Appellant,

v.

The S.S. "WASHINGTON TRADER," her engines, tackle, apparel, etc; American Trading and Production Corporation: Joseph V. Finn, Jr., Defendants-Appellees.

C.A. No. 79–4126.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 9, 1981.

Decided March 30, 1981.

Eric J. Schmidt, San Francisco, Cal., for plaintiff-appellant.

Frederick W. Wentker, Jr., San Francisco, Cal., for defendants-appellees.

Before CHAMBERS, TRASK and SCHROEDER, Circuit Judges.

PER CURIAM:

This is a case involving application of 46 U.S.C. § 596[1] to determine the amount of

---

**1.** Section 596 reads:

damages owed to a discharged seaman on account of late payment of wages. It is before this court for the second time, the Supreme Court having vacated our first judgment.[2] Appellant Escobar appeals from judgment rendered against him in the amount of $212.62. We have jurisdiction under 28 U.S.C. § 1291. We affirm.

A detailed recitation of the facts can be found in our first opinion, published at 503 F.2d 271 (1974). Escobar was a seaman employed aboard the SS Washington Trader (the Trader). He was validly discharged from the Trader in the Philippines on March 5, 1969. After five days in the hospital, he was contacted by the Philippine agent of the company that owns the Trader (the Company) for arrangement of his passage home. At this time, Escobar demanded that the agent pay him the wages he had earned up to the time he was discharged. The response was that Escobar had to travel to San Francisco to face charges brought by the Coast Guard, and that his wages would be paid to him there.

Escobar was without money at the time he was discharged, and had no means of getting to San Francisco. In return for Escobar's promise to reimburse it, the Company advanced to its agent on Escobar's behalf $536.72 to buy him an airplane ticket to San Francisco and to pay the Philippine government for certain expenses that it claimed in connection with Escobar's discharge. The Company also paid Escobar's $245.00 hospital bill. Escobar left the Philippines for San Francisco on March 13. On April 4, the Company paid Escobar $346.32, which represented his wages due ($883.04) less the $536.72 expended to buy his ticket and to reimburse the Philippine government.

In June, 1970, Escobar filed an action in the district court against the Company seeking, *inter alia*, double wage damages pursuant to 46 U.S.C. § 596. Section 596 provides that if a shipowner refuses or neglects to pay a discharged seaman his wages within four days of his discharge, the shipowner shall pay to the seaman for each day of further delay a penalty equal to twice the seaman's daily wages, unless the shipowner can show cause for the delay. Shortly after the case was filed, the Company, on the advice of counsel and without waiving any of its rights in the action, tendered to Escobar $536.72 in cash, representing the amount withheld from his wages for the Philippine expenses.

The district court found that the Company had had good cause to delay paying Escobar his wages until March 10, 1969,[3] but that he should have been paid within four days thereafter. Thus, the court held that Escobar was entitled to the statutory penalty for any delay after March 14. The court treated as an advance on Escobar's wages the $536.72 expended by the Company to pay for Escobar's return to San Francisco. It held, therefore, that the Company was justified in deducting this amount from the total wages due Escobar ($883.04). It also held that the Company's wage obligation to Escobar had been terminated (and the penalty period tolled) on April 4, 1969,

---

The master or owner of any vessel making coasting voyages shall pay to every seaman his wages within two days after the termination of the agreement under which he was shipped, or at the time such seaman is discharged, whichever first happens; and in case of vessels making foreign voyages, or from a port on the Atlantic to a port on the Pacific, or vice versa, within twenty-four hours after the cargo has been discharged, or within four days after the seaman has been discharged, whichever first happens; .... Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable as wages in any claim made before the court; ....

2. *American Trading Transp. Co. v. Escobar*, 423 U.S. 1070, 96 S.Ct. 852, 47 L.Ed.2d 80 (1975) (vacating and remanding 503 F.2d 271 (9th Cir. 1974) for further consideration in light of *American Foreign Steamship Co. v. Matise*, 423 U.S. 150, 96 S.Ct. 410, 46 L.Ed.2d 354 (1975)).

3. The apparent basis for this finding was that Escobar was in the hospital and did not make a demand for his wages until that time.

when the Company tendered to Escobar $346.32 ($883.04 less $536.72), representing the balance of his wages. Accordingly, the judge awarded Escobar $569.10 (double wages for the twenty-one days from March 14 to April 4, 1969). Finally, the judge found that the Company was entitled to reimbursement for the hospital bill that it had paid for Escobar ($245.00), and for the additional $536.72 that it had tendered to him after the commencement of litigation. After setting-off the amounts to which each party was entitled, the judge awarded the Company a net judgment of $212.62 ($536.72 plus $245.00 less $569.10).

We find this case to be controlled by *American Foreign Steamship v. Matise*, 423 U.S. 150, 96 S.Ct. 410, 46 L.Ed.2d 354 (1975). In that case, seaman Matise was discharged for cause while his ship was docked in Saigon, South Vietnam. Although his employer was apparently willing to pay Matise his wages due, such payment was legally impossible. Under South Vietnamese law, American seamen were prohibited from carrying American currency ashore with them, and any ship's safe which contained such currency was required by law to be sealed while the ship was in port. Moreover, airline tickets could be purchased only with American currency. *Id.* at 153 & n.4, 96 S.Ct. at 413 & n.4.

To resolve the dilemma, Vietnamese officials gave permission to open the safe and remove enough currency to purchase an airline ticket to the United States ($510.00). The ticket was purchased and given to Matise along with a wage voucher for the amount of wages due him, less $510.00. Matise flew home, and ultimately filed suit against his former employer pursuant to section 596. *Id.* at 154, 96 S.Ct. at 413.

The Court articulated the threshold question as whether the employer's purchase and Matise's receipt of the ticket constituted partial payment of wages. *Id.* at 156, 96 S.Ct. at 414. If so, it reasoned, there was

no "refusal or neglect" to pay wages, and no penalty due under section 596. *Id.* The Court rejected the Court of Appeal's conclusion that the ticket did not constitute wages because "'payment' went to the airline rather that to Matise" as required by the literal language of section 596. *Id.* at 158–59, 96 S.Ct. at 415. Although it intimated that the ticket could be characterized as a payment-in-kind, the Court ultimately concluded that the payment was not precluded by the language of section 596 because the employer was not unjustly enriched, having timely made all expenditures that it was required to make, and because Matise received the benefit of the $510.00 by consenting to have it used to purchase an airline ticket. *Id.* at 159–60, 96 S.Ct. at 415–16.

Although the case now before us lacks the complications of local law that were present in *Matise*, it does not materially differ from that case. The Company was not unjustly enriched. The expenditures that it made on Escobar's behalf were all expenses for which Escobar was personally responsible, and which he would have had to pay himself when he left the Philippines. Moreover, Escobar expressly approved the expenditures that were made for him.[4] The balance of Escobar's wages were tendered to him in cash upon his arrival in San Francisco, and he has been awarded the statutory double-wage penalty for the intervening period of delay.

■■■ Accordingly, we hold that the $536.72 expended by the Company in the Philippines on Escobar's behalf constituted a partial payment in kind of his wages due. *See American Foreign Steamship Co. v. Matise, supra*, 423 U.S. at 157–59, 96 S.Ct. at 414–15. The $346.32 paid to Escobar on April 4 extinguished its $883.04 wage debt to him, and tolled the running of the statutory penalty period. Thus, the Company was not obligated to pay Escobar the additional $536.72, and is entitled to receive it

---

4. The validity of this consent is adequately supported by the record. Escobar's signature appears on the document that sets forth his approval of the expenditures and his promise to reimburse the Company. Independent witnesses testified that Escobar can read, and that he was given ample opportunity to review this document before signing it.

back from him. Additionally, we reaffirm our earlier holding that Escobar must reimburse the Company for the $245.00 hospital bill which it paid, and that this amount is properly set-off against the $569.10 wage penalty to which Escobar is entitled. *See Escobar v. SS Washington Trader*, 503 F.2d 271, 273 (9th Cir. 1974), *vacated on other grounds sub nom. American Trading Transportation Co. v. Escobar*, 423 U.S. 1070, 96 S.Ct. 852, 47 L.Ed.2d 80 (1976). The district court's net judgment of $212.62 in favor of the Company is AFFIRMED.