**Macario VINUELA, Plaintiff,**

**v.**

**S.S. "BRITANIS", her engines, boilers, tackle, appurtenances, etc., the S.S. "DOLPHIN", her engines, boilers, tackle, appurtenances, etc., and Chandris Incorporated, Ajax Navigation Corp., Britannis Ship Services, Limited, and Apollo Ship Chandlers, Inc., Defendants.**

**No. 84 Civ. 5608 (LLS).**

United States District Court, S.D. New York.

Oct. 30, 1986.

Phillips & Cappiello, P.C., New York City, for plaintiff; Paul T. Hofmann, of counsel.

Hill, Betts & Nash, New York City, for defendants S/S Britanis, Chandris, Inc. and Ajax Navigation Corp.; Gregory O'Neill, Robert P. Lewis, of counsel.

Burlingham Underwood & Lord, New York City, for defendants Apollo Ship Chandlers, Inc. and Britannia Ship Services, Ltd.; Terry L. Stoltz and Richard J. Reisert, of counsel.

## OPINION AND ORDER

STANTON, District Judge.

In this admiralty action, plaintiff Macario Vinuela, a citizen of Spain and at relevant times a dining room employee aboard the cruise ships "BRITANIS" and "DOLPHIN IV", sues for wages, overtime pay and other surcharges and payments allegedly owed him for his services aboard the "BRITANIS" in May and June 1983. The defendants in this action are "BRITANIS" and "DOLPHIN IV";[1] Ajax Navigation Corp., owner of the "BRITANIS"; Chandris, Inc., managing agent for "BRITANIS"; Britannia Ship Services, Ltd., food concessionaire for the "BRITANIS"; and Apollo Ship Chandlers, Inc., supplier of food, beverages and galley and dining room personnel to "BRITANIS" as agent of Britannia Ship Services. After a nonjury trial, I find for the defendants.

## FACTS

From my observation of the witnesses and exhibits at trial, I find the preponderance of the credible evidence establishes the facts as follows.

In April 1983 plaintiff, then a waiter in a seasonal hotel dining room in Spain, went to Madrid to interview for work in the United States. In Madrid he met Jorge Treserra who, as Personnel Manager for defendant Apollo Ship Chandlers, hired personnel for ships' dining rooms. Mr. Treserra agreed on behalf of Britannia Ship Ser-

---

1. Plaintiff asserts no claim against defendant S.S. "DOLPHIN IV".

vices to employ plaintiff. He was hired to be one of three assistant maitres d'hotel on the "BRITANIS". During the conversation between plaintiff and Mr. Treserra it was agreed that plaintiff would be paid a salary of $800 per month plus tips which, for an assistant maitre d'hotel, could total $700 to $800 a month. Since plaintiff had never worked on a ship before, Mr. Treserra explained the nature of the work and the long hours. There was no discussion of overtime pay, holidays, week-end or Sunday work, or other such benefits. Mr. Treserra told plaintiff that he would be entitled to a vacation after nine month's work. He also told plaintiff that he would pay his own fare to the ship's berth in New York. When plaintiff remonstrated, Mr. Treserra explained that if the employer forwarded the amount of the ticket, the employee might not show up. Plaintiff then agreed to pay his own fare. There was no agreement that the fare would be refunded after plaintiff arrived.

Plaintiff flew to the United States and boarded the "BRITANIS" in New York on April 30, 1983. From then until May 13, when the passengers boarded for the season's first cruise, he assisted in restoring the restaurant to normal operation as the vessel recommissioned after a six-month lay-up. Dining room equipment had to be brought in from storage, linen and cutlery cleaned, and the ship's officers and staff fed as preparations were made to receive passengers on May 13. During this two-week period plaintiff was required to work from 8:00 a.m. to noon, and from 1:00 p.m. to 3:30 p.m. in the afternoon. Otherwise, he was at liberty to go ashore, and it was during that time that he met and fell in love with his future wife.

On May 15 plaintiff was paid $426.56 representing $400 for the first half of the month of May and $26.56 for the extra day's work on April 30.

After the passengers came aboard on May 13 the "BRITANIS" took a series of short cruises. The first was a one-day "cruise to nowhere" (that is, simply a day's steaming), followed by a two-day cruise, and four-day and five-day cruises to Bermuda. After each cruise the vessel returned to port in New York. During these cruises the passengers were served four meals a day: breakfast, consisting of two sittings starting at 7:30 a.m. and ending at 10:00 a.m.; lunch, consisting of two sittings starting at noon and ending at 3:00 p.m.; dinner, consisting of two sittings starting at 6:00 p.m. and ending at about 10:15 p.m.; and a midnight buffet that lasted from midnight until about 1:30 a.m. and required the presence of one assistant maitre d'hotel. Each of the regular meals required the presence of the maitre d'hotel and all three assistants, except that the assistant maitre d'hotel who was responsible for the midnight buffet was excused from duty at breakfast the following morning.

Since the staff was required to be present at least twenty minutes or one-half hour before each meal and for the half-hour cleanup at its conclusion, plaintiff was effectively on duty during the periods 7:00 a.m. to 10:30 a.m., 11:30 a.m. to 3:30 p.m. and 5:30 p.m. to 10:45 p.m. These periods totaled almost thirteen hours a day, subject to the variations on those evenings when he had the midnight buffet and was therefore relieved of duty for the following morning's breakfast.

When the ship cruised to Bermuda, it stayed in that port for one day. Since few passengers remained aboard, only one assistant maitre d'hotel was required to be on duty for that shift. The other two were given the day off. Thus, during those times, plaintiff could spend his day ashore in Bermuda.

As a restaurant staff member, plaintiff was under the supervision of the maitre d'hotel, Mr. Alex Lomba, and his superior the Food Service Manager, Mr. Luis Alcobas. It came to Mr. Alcobas' attention that the maitre d'hotel was unhappy with plaintiff's performance. Mr. Alcobas thereafter paid particular attention to plaintiff and observed that the passengers seemed unable to get his attention, that he was some-

times not at his proper position, that he failed to notice when food or plates needed replacement or refilling and that he divided his attentions unevenly among the passengers. Mr. Alcobas attempted some corrective instructions, but concluded that plaintiff was insufficiently experienced to be able to continue serving as an assistant maitre d'hotel on vessels catered by Apollo. By May 20 another waiter had been appointed assistant maitre d'hotel in preparation for taking over plaintiff's position.

At the end of May, Mr. Alcobas told Mr. Jose Candiera, a trainee for Assistant Food Manager under Mr. Alcobas' supervision, to fire plaintiff. After Mr. Candiera spoke with plaintiff, plaintiff asked Mr. Alcobas why he had been fired, to which Mr. Alcobas responded that plaintiff's work had not been up to standard, probably because of his unfamiliarity with customs in the United States. Pointing out that he had come a long way from Spain for the job, plaintiff asked for a second chance. Mr. Alcobas offered a transfer to another ship, the "DOLPHIN IV", as a waiter, and suggested that plaintiff might use the position to learn and work up to assistant maitre d'hotel. Plaintiff agreed.

At the May 31 payday on board the "BRITANIS," the $400 balance of plaintiff's pay for the month of May was withheld and, together with $231 collected from plaintiff (totalling $631), was retained by Apollo to cover the price of a return ticket to Spain for plaintiff. At the same time, Apollo purchased a ticket for $104 (out of the $631) for plaintiff's flight from New York to Miami to board the "DOLPHIN IV".

After a few days delay, plaintiff proceeded to Miami. The "Dolphin IV" was at sea when he arrived, and he was lodged in a Miami hotel at Apollo's expense until the "DOLPHIN IV" returned and he joined her on June 10. Plaintiff claims that he was delayed by illness; defendants claim he simply failed to report to his new assignment on time, thus missing the trip and incurring extra expenses. The only appar-

ent significance of that dispute stems from the fact that plaintiff turned in the ticket which Apollo issued him for the flight and purchased a later ticket for $124 with his own funds, for which he now seeks reimbursement. It is uncontested that plaintiff spent the intervening time with his wife-to-be. Aside from his own testimony which I find unreliable, there is no evidence of his illness during that time. I find as a fact that this delay was not necessitated by illness. This determination is supported by the absence of any apparent report of sickness to his employer either during the delay or upon his arrival in Miami, and the absence of any claim of recent incapacitation during a physical examination which he received in Miami. There is no evidence that plaintiff's diagnosed diabetes required the delay in reporting aboard the "DOLPHIN IV".

Plaintiff's experience on the "DOLPHIN IV" was unsatisfactory from both sides' point of view. He claims he was surprised to find that he was expected to work as a waiter and refused to continue. The defendants' evidence suggests that he got along badly with his co-workers and superiors. The stipulated fact, which I accept, is that he departed the "DOLPHIN IV" by mutual consent on June 24. Plaintiff received a $528 plane ticket from Mr. Treserra for his return trip to Spain (Tr. 293), which depleted the funds in his transportation account held by Apollo. Since plaintiff did not wish to return to Spain, he exchanged the ticket for cash, which he kept.

After a short trip to the Bahamas, Mr. Vinuela remains happily married in the United States where he is a legal resident.

Plaintiff's testimony is sharply at odds with the foregoing findings on various points. For example, he testified that during the conversation with Mr. Treserra in Madrid, he was promised overtime at the rate of 50 percent after the first forty, forty-two or forty-five hours (he was not clear which), vacation pay, holidays and all other benefits provided under the law of Panama. With respect to his work aboard

the "BRITANIS" during the April 30 to May 13 refitting period, he testified that he was required to labor for sixteen hours or more a day, was not permitted to leave the ship and had to do deck crew work such as cleaning corridors and bulkheads. With regard to the termination of his employment on the "BRITANIS", he insists that he was to be transferred to the "DOLPHIN IV" as an assistant maitre d'hotel. On each of these points, and wherever else his testimony conflicts with the above findings, I rule against him based upon my observation of his demeanor, the testimony of the other witnesses and the documents. I find the testimony of Mr. Treserra and Mr. Alcobas credible and consistent and accept their testimony wherever it conflicts with that of plaintiff.

Thus, I find that Mr. Vinuela was hired for $800 per month, plus whatever amount he received in tips (which the evidence shows was approximately $350 in a two-

2. Plaintiff argues that two statutory presumptions contained in Articles 69 and 152 of the Panamanian Labor Code require me to find the facts concerning the agreement as plaintiff states them: that he was "offered and [he] accepted employment with a base wage of $800 plus overtime and tips." Plt. Post-Trial Brief at 10. Article 69 reads:
    In the absence of a written contract, facts and circumstances alleged by the workman which should appear in said contract, will be presumed to be true.
    This presumption may be rebutted by evidence that does not admit a reasonable doubt.
  Article 152 reads:
    The employer must specify in his payrolls, separately, what each of his workmen shall receive in ordinary work, overtime and bonuses or commissions.
    If express specifications are not made in the payrolls, what is indicated therein will correspond to the ordinary wage.

      .    .    .    .    .
    Article 68 specifies those terms which are required to appear in a written contract. Plaintiff points to items 6 and 7 of Article 68, which read "6. Duration and regular division of the work day. 7. Salary: its amount, form, day and place of payment." He asserts that, in the absence of a written contract between himself and Apollo, his "$800 ... base salary ... [and] what ... hours [it] was ... intended to cover before overtime payments were to be made" must be presumed to be as he states them. Plt. Post-Trial Brief at 12.

week period), with no contractual provision for overtime pay.[2] That poses the legal question whether that agreement comports with the applicable law. Since both the "BRITANIS" and the "DOLPHIN IV" are Panamanian flag vessels, the applicable law is the Labor Code of the Republic of Panama ("Labor Code").

### DISCUSSION

Plaintiff claims that the contract calling for a fixed sum salary is void under Article 8 of the Labor Code because it "relinquish[es] [his] right to be paid overtime". Plt. Post-Trial Brief at 19. Article 8 provides that

> Those provisions, acts or declarations contained in any labor agreement or in any other pact that imply impairment, adulteration, waiver or relinquishment of rights to which the workmen are entitled, are null and do not bind the contracting parties.

Defendants' expert witness on Panamanian Labor Law, Dr. Arturo Hoyos, holds that "[u]nder the law of Panama, overtime is not an item specified in Article 68 which must appear in the written contract [and] [a]ccordingly, the Article 69 presumption ... would have no application to this dispute...." Hoyos Aff., sworn to April 14, 1986, ¶ 27 at 16.

I accept Dr. Hoyos' unrebutted expert testimony and find the Article 69 presumption inapplicable here. *See Pierre v. Hess Oil Virgin Islands Corp.,* 624 F.2d 445, 447 n. 2 (3d Cir.1980) (based on Dr. Hoyos' treatise, court finds Article 69 presumption inapplicable to overtime work). In any event, defendants have sufficiently rebutted the presumption through the testimony of their witnesses.

The Article 152 presumption that in the absence of specifications to the contrary, an expressed amount of salary will equal base wage is inapplicable. Its purpose is to encourage employers to distinguish clearly between base pay and any of the varied surcharges for which Panamanian law provides and to which the employee may be entitled, so that "the common man [will] not be confused with all [the] complicated calculations", Tr. 419. Since there is only one surcharge applicable for workers aboard international vessels, *see* pp. 1145–1146 *infra*, that purpose is not served by enforcing the presumption against maritime employers. Moreover, the presumption is rebuttable, Tr. 419, and defendants have rebutted it.

Plaintiff asserts that he has a right to overtime pay under the Labor Code. He claims that since he worked more than three hours between 6 p.m. and 6 a.m. each day, his work period is classified as a "night shift" (Art. 30),[3] his maximum work period is seven hours a day, or forty two hours per week (Art. 31),[4] and he is entitled to a 50 per cent surcharge for work time exceeding his prescribed limit (Art. 33).[5] He claims that a contract providing for a fixed sum salary inclusive of overtime necessarily impairs his rights under Articles 30, 31 and 33 and thus is "not allow[ed]" under the Panamanian Labor Code. Plt. Post-Trial Brief at 17–18.

Plaintiff concedes that he is subject to the special provisions in Chapter VIII of the Labor Code (Articles 251–278), which specifically apply to workers aboard vessels in international service. Article 251 provides:

> The relations between employers and workmen on ships which are devoted to international service, are governed in general by this Code and especially by the provisions of this section.

Article 275 provides:

> In cases not regulated by this Code, international maritime practices and customs shall be applied as well as international agreements on the matter.

Plaintiff asserts, however, that since no provision in Chapter VIII specifically designates the maximum work shift for a worker on an international vessel or the hours for which he will be paid overtime, as Articles 30 and 31 do, Article 251 requires resort to the general provisions of the Code, i.e., Articles 30, 31 and 33, to determine these rights.

■ However, Articles 30, 31 and 33 do not apply to maritime work. Article 260 of Chapter VIII establishes that, with respect to workers on ships in international service, it is "the exclusive jurisdiction of the master to specify the hours of work and watches, in accordance with maritime usage...."[6] Article 261 provides in pertinent part:

> All members of Panamanian vessels engaged in international service, whose effective work time exceeds the legal limits

---

**3.** Article 30. The day is divided into the following shifts or working periods:

   1. Day work: from 6 a.m. to 6 p.m.

   2. Night work: from 6 p.m. to 6 a.m.

Hours of work within the above-mentioned working periods shall be classified as day shift ("day work") and night shift ("night work") respectively. A shift comprising more than three hours within the night working period, will be considered a night shift.

A mixed shift is that comprising hours in both periods of work, provided that the period of night service shall be less than three hours.

**4.** Article 31. The maximum day shift of work shall be eight hours and the corresponding workable week, up to forty eight hours.

The maximum night shift shall be seven hours and the corresponding work week up to forty two hours.

The maximum duration of the mixed shift shall be seven hours and a half, and the corresponding work week up to forty five hours.

Work in seven night hours, and seven and a half hours of the mixed shift shall be paid as eight hours of daily work for purposes of the calculation of the legal or contractual minimum wage, or of the wages that are paid in an undertaking with work shifts in different periods.

**5.** Article 33. Working hours shall mean the time which the workman may not use freely because he is subject to the orders of the employer.

Work time, exceeding the limits set forth in the preceding article, or of lower contractual or legally prescribed limits, constitutes overtime and will be paid as follows:

   1. 25% increase in wages when work is performed during the daytime.

   2. 50% increase in wages when work is performed during the night period or when the mixed shifts started in the daytime are prolonged.

   3. 75% increase in wages when the overtime work shift is an extension of the night shift or the mixed shift, started during the night period.

**6.** Article 260. It lies within the exclusive jurisdiction of the master to specify the hours of work and watches, in accordance with maritime usage, without prejudice to the authorities in that field intervening whenever the vessel is in port, in order to apply the principles and provisions of social justice infringed.

or less because of contractual clauses, shall be entitled to be paid overtime with a surcharge of not less than 25% on the wages accrued.

The "legal limit" for a work period is forty eight hours a week, provided no more than seven hours are worked during the night hours in a single day. Hoyos Aff. ¶ 12 at 9. Thus, while the special provisions applicable to maritime workers (Chapter VIII) do not distinguish between day, night and mixed shift workers and instead allow the ship's master to designate the working hours, *see* Opinion of Minister of Labor and Social Welfare (Exh. 1 to Hoyos Aff.), March 10, 1986, at 3 ("It is precisely due to [the] special characteristics of work on the seas, among which is comprised the right of the captain of the ship to determine the working day length and shifts, that no distinction is made between a day, night and mixed shift"), they do specify a minimum overtime surcharge (25%) to be paid for hours worked which exceed the legal limit. The Ministry of Labor and Social Welfare for the Republic of Panama[7] has stated that "the only applicable provision concerning overtime on board of vessels engaged in the international trade is Article 261 of said Code." Exh. 2 (Feb. 7, 1986) to Hoyos Aff. Accordingly, Articles 30, 31 and 33 are not applicable to maritime service. *See* Opinion (Exh. 1 to Hoyos Aff.); Exh. 2 to Hoyos Aff.; Hoyos Aff. ¶ 10 at 6–7; Tr. 411–22.

■ As plaintiff correctly asserts, no provision in Chapter VIII specifically allows a fixed rate salary inclusive of overtime. The Minister of Labor and Social Welfare has stated that "it is evident that our labor legislation has bestowed singular importance to international maritime usages and customs in the determination of labor conditions on Panamanian ships, as may be inferred from Articles 260 and 275 of our Code." Opinion at 2 (Exh. 1 to Hoyos Aff.). International custom in the maritime industry permits a fixed monthly wage for workers on vessels. *See id.* at 4; Opinion of General Director of Consular and Maritime Affairs (Exh. 3 to Hoyos Aff.), April 4, 1986. The Minister has stated that "this Ministry is cognizant by virtue of communications received from our consulates abroad, that in accordance with usages and customs adhered to internationally, contracts for crews and personnel of ships in international services contemplate a fixed monthly wage and a rate of surcharge which is in no relation to the basic contractual wage but equals or exceeds an amount constituted by the common minimum salary plus 25% surcharge on such amount." Opinion at 3–4 (Exh. 1 to Hoyos Aff.).

■ The fixed sum salary is a valid method of compensation to maritime workers under Panamanian law as long as the fixed salary equals or exceeds the minimum wage for crew members aboard ships (59 Balboa cents per hour) plus 25% overtime surcharge for all hours worked over forty eight in one week. Plaintiff worked approximately 13 hours per day, *see* p. 1141 *supra*, and 91 per week. Thus his minimum monthly wage under Panamanian law would have been $240.56 (48 hours straight time at .59 + 43 hours overtime at .74 = $60.14 per week).

Plaintiff's salary of $800 per month plus service tips, which equaled approximately $350 for plaintiff's first two-week period, far exceeded the minimum allowed, and thus complied with the "underlying intent of the Labor Code ... [which] is to protect workers by establishing minimum standards which may not be violated even by agreement of the workers and their employer." Hoyos Aff. ¶ 6 at 4. Accordingly, the fixed sum salary is valid under Panamanian law.

Plaintiff is not entitled to any of the additional wages which he claims are owed him.

---

7. "When questions of interpretation of the Code arise, it is customary for parties to seek interpretive opinions from the Ministry of Labor and Social Welfare. Those interpretive opinions are authoritative and relied upon." Hoyos Aff. ¶ 6 at 4.

■ (1). Because Article 261 is the only article applicable to overtime on Panamanian flag vessels, the provisions for Sunday and alternate rest day surcharges (Art. 48) and holiday pay (Art. 49) do not apply to plaintiff. A worker at sea is paid a minimum 25% surcharge for all hours worked exceeding the legal limits, irrespective of whether the overtime hours are worked on Sunday or another day. Hoyos Aff. ¶ 17–18 at 11–12. The policy supporting the payment of a surcharge for work time on Sunday (or an alternate rest day) is to compensate a worker for work time which would otherwise have been spent with his family. *See ibid.* Since a worker at sea cannot return to his family on Sundays or rest days, the policy would not be furthered by requiring payment of the surcharge to him. Similarly, the policy underlying the holiday surcharge is not applicable to maritime service. The surcharge compensates workers for work time which could otherwise have been spent "participating in the collective rejoicing of the holiday" and also "to encourage employers to permit workers freedom to participate in such collective activities...." Hoyos Aff. ¶ 19 at 12. The nature of maritime services is such that these policies would not be advanced by requiring that this extraordinary surcharge be paid maritime workers.

(2). Vacation benefits (Art. 262) are payable to a crew member who has served "twelve months of uninterrupted service". Plaintiff did not do that. *See* Hoyos Aff. ¶ 15 at 10; *Markakis v. S.S. Volendam,* 475 F.Supp. 29 (S.D.N.Y.1979).

(3). "Thirteenth-month" benefits, which are paid to employees within the Republic of Panama in installments in April, August, and December of each year, are not paid to non-Panamanian nationals employed on Panamanian flag vessels engaged in international service. Opinion of General Director of Consular and Maritime Affairs (Exh. 3 to Hoyos Aff.), April 4, 1986; Tr. 425–26; Hoyos Aff. ¶ 21–23 at 13–14. *Compare Herrera v. Texaco Panama, Inc.,* First Labor Court, First Section, Feb-ruary 4, 1986, *aff'd* Superior Labor Court of Panama, March 17, 1986 (Panamanian nationals working aboard Panamanian flag vessels are entitled to thirteenth month benefits) (App. Exh. 3 and 4 to Plt. Post-Trial Brief).

■ (4). Plaintiff is not entitled to severance pay. An employer may "terminate the labor relation ... [where] there is a justified cause provided for by the law...." Art. 211. "[P]atent inefficiency of the workman" is just cause. Art. 213(B)(1). Mr. Alcobas decided to fire plaintiff (or offer him a job as a waiter aboard another ship) because "[w]hether it was lack of knowledge or attention," Tr. 334, plaintiff's performance of his duties as an assistant maitre d'hotel was unsatisfactory. He determined that plaintiff was inattentive to his duties and paid inordinate attention to some female passengers. Mr. Alcobas testified that "I guess [plaintiff] didn't know the American kind of way to approach customers, ... [a]nd I hoped that he was going to build up something, but it didn't happen that way." *Id.* at 335.

Mr. Vinuela claims that his threatened discharge, and his transfer to the "DOLPHIN IV", resulted from his complaints to defendants about conditions in his living quarters on the "BRITANIS". If his living conditions were as he described them, his complaints were justified. I accept, however, Mr. Alcobas' testimony that Mr. Vinuela's employment aboard the "BRITANIS" was terminated because of his unsatisfactory performance, rather than as retaliation for his complaints.

(5). Plaintiff claims wages for work aboard the "BRITANIS" on June 1 and 2, 1983. It is not contested that plaintiff was aboard the ship on those days. Plaintiff claims he worked both days (Tr. 44). However, I accept the testimony of Mr. Alcobas that plaintiff's last day of work aboard the "BRITANIS" was May 31, 1983 (Tr. 342) and that he remained on the ship "using the place as a hotel" until arrangements were made for him to transfer to the "DOLPHIN IV" (*ibid.*). On June 2, 1983

plaintiff was given a plane ticket for a flight to Miami that was scheduled to depart from New York that same day. Since I find that plaintiff did not work on June 1 and 2, 1983, he is not entitled to wages for those days.

■ (6). Plaintiff claims he is entitled to be reimbursed for the costs of his transportation from Spain to New York to join the "BRITANIS" and from New York to Miami to join the "DOLPHIN IV". As stated above, there was no agreement between Mr. Vinuela and Mr. Treserra that Apollo or any other defendant would reimburse plaintiff's transportation costs to New York. There was no such agreement regarding his trip to Miami. Nor does the Labor Code entitle plaintiff to reimbursement. Article 255 obliges the employer only "to return the workman to the place or port where he embarked before the employment relationship is terminated." The crew member is responsible for his own transportation costs to and from the port of embarkation. Hoyos Aff. ¶ 20 at 12–13.

■ Nor did defendant Apollo unlawfully withhold wages from plaintiff in violation of 46 U.S.C. §§ 596 and 599 when it placed plaintiff's earned wages in a transportation account to be used to purchase airplane tickets. Under §§ 596 and 599, "a double wage penalty may be assessed in appropriate circumstances against a 'master or owner' for the unreasonable withholding of wages." *Morewitz v. Andros Compania Maritime, S.A.*, 614 F.2d 379, 381 (4th Cir.1980). Section 599 reads in pertinent part:

> It shall be unlawful in any case to pay any seaman wages in advance of the time when he has actually earned the same, or to pay such advance wages, or to make any order, or note, or other evidence of indebtedness therefor to any other person, or to pay any person, for the shipment of seamen when payment is deducted or to be deducted from a seaman's wages.

Section 596 reads in pertinent part:

> The master or owner of any vessel making coasting voyages shall pay to every seaman his wages within two days after the termination of the agreement under which he was shipped, or at the time such seaman is discharged, whichever first happens....

Defendants did not advance to plaintiff or allot any of his wages within the meaning of § 599. Nor did defendants withhold his wages after discharge in violation of § 596. Defendant Apollo placed plaintiff's earned wages for the period from May 15–31, 1983 ($400) in a transportation account, to be used to purchase plaintiff's tickets to Miami and home to Spain when his employment with Apollo ended. Plaintiff on request contributed an additional $231 to the account (Tr. 340). He was given a ticket to Miami ($104) on June 2, 1983 and, when his employment on the "DOLPHIN IV" terminated, a return ticket to Spain ($528). (Tr. 55–6). Not wishing to return to Spain, plaintiff exchanged the ticket for cash. (Tr. 57).

■ The statutes plaintiff cites (§§ 596 and 599) do not prevent an employer from setting aside a crew member's earned wages for his transportation expenses to his home country once he leaves the ship's employ. *Cf. Escobar v. S.S. "WASHINGTON TRADER"*, 640 F.2d 1063, 1064–65 (9th Cir.1981) (payment on seaman's behalf to buy him an airline ticket for whose payment he was responsible constitutes partial payment in kind of his wages). *Compare Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 780–82, 72 S.Ct. 1011, 1013–14, 96 L.Ed. 1294 (1952) (employer may not set-off against seaman's wages its expenditures for the medical care and hospitalization of another crew member necessitated by injuries inflicted on him by the seaman during the voyage on which the wages were earned); *Venides v. United Greek Shipowners Corp.*, 168 F.2d 681 (2d Cir.1948) (seaman entitled to "double pay" penalty under §§ 596 and 597 where employer deducted "compulsory savings" from seaman's earned wages and refused to pay the

amount withheld on plaintiff's demand at the end of the voyage).

Defendants' request pursuant to Fed.R.Civ.P. 11 for sanctions, including attorneys' fees, is denied.

In *Eastway Construction Corp. v. City of New York*, 762 F.2d 243 (2d Cir.1985), this Circuit's Court of Appeals held that an objective test governs Rule 11 motions:

> In light of the express intent of the drafters of the new Rule 11, and the clear policy concerns underlying its amendment, we hold that a showing of subjective bad faith is no longer required to trigger the sanctions imposed by the rule. Rather, sanctions shall be imposed against an attorney and/or his client when it appears that a pleading has been interposed for any improper purpose, *or where*, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact or a good faith argument for the extension, modification or reversal of existing law.

*Id.* at 253–54 (footnote omitted) (emphasis in original); *see also Oliveri v. Thompson*, 803 F.2d 1265 (2d Cir.1986). Under this standard, Rule 11 is violated "where it is patently clear that a claim has absolutely no chance of success under the existing precedents, and where no reasonable argument can be advanced to extend, modify or reverse the law as its stands." *Eastway Construction Corp.*, 762 F.2d at 254; *Oliveri*, at 1275.

 The focus of the inquiry is the attorney's and/or party's reasonable belief at the time of filing, not at some later time when developments during discovery or trial reveal no basis for the belief. *See Utica Mutual Ins. Co. v. Fireman's Fund Ins. Co.*, 613 F.Supp. 1134, 1137 (S.D.N.Y.1985); Fed.R.Civ.P. 11, Notes of Advisory Committee on Rules. This construction of Rule 11 "serves to punish only those who would manipulate the federal court system for ends inimicable to those for which it was created." *Eastway Construction Corp.*, 762 F.2d at 254.

In this case it was by no means "patently clear" at the time the plaintiff's attorney filed the complaint and amended complaint that the claim had no chance of success, or was unreasonable and groundless. Many of the points discussed above presented valid factual and legal issues constituting fair grounds for litigation. They were not obviously hopeless points at the beginning, although decided adversely to plaintiff at the end.

## CONCLUSION

The contract between Mr. Vinuela and defendants Apollo and Britannia Ship Services providing for a fixed sum salary inclusive of overtime is valid under Panamanian law. Plaintiff is not entitled to the additional wages, overtime, or any other surcharges or payments that he claims are owed him. Defendants' request pursuant to Fed.R.Civ.P. 11 for sanctions, including attorneys' fees, is denied.

The Clerk will enter judgment dismissing the complaint with costs.