**Diosdado MATEO, et al., Plaintiffs,**

v.

**The M/S KISO, et al., Defendants.**

**No. C–90–2357 DLJ.**

United States District Court, N.D. California.

Aug. 13, 1991.

On Motion For Reconsideration Nov. 19, 1991.

Marvin Stender, of McTernan, Stender & Walsh of San Francisco, Cal., and Richard Dodson, Sole Practitioner, of Baton Rouge, La., for plaintiffs.

Frederick W. Wentker, Jr., and Phillip Dalton, Esq. of Lillick & Charles of San Francisco, Cal., for defendants.

## ORDER

JENSEN, District Judge.

The present motions came on for hearing before this Court on June 14, 1991. Richard Dodson appeared for plaintiffs. Frederick Wentker appeared for defendants. For the reasons set out below, plaintiffs' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Defendants' motion for summary judgment is DENIED, subject to the terms of this Order. Plaintiffs' motion for class certification is DENIED. Defendants' motion for dismissal of plaintiffs' class allegations without leave to amend is GRANTED. Defendants' motion to strike paragraph 15 of the complaint[1] is DENIED. Defendants'

---

**1.** Plaintiffs' present complaint is an amended complaint filed on December 3, 1990 after plain-

tiffs' original complaint was dismissed with leave to amend. Unless otherwise specified, all

motion for leave to deposit funds into the Court is GRANTED.

## I. BACKGROUND.

The present motions arise from an action by twenty Filipino seamen working aboard the M/S Kiso (the "Kiso") against the Kiso, *in rem*, and the owners and managers of the Kiso. The Kiso is a Liberian flagged vessel which carries goods between the U.S. and Japan. The title owner of the Kiso is defendant Vesta Company, Ltd, ("Vesta") a Liberian corporation. The beneficial owner of the Kiso, however, is a Japanese corporation, defendant Nippon Yusen Kaisha Ship Management Corporation ("NYK"). The officers of the Kiso are also all Japanese. Vesta contracted the responsibility for managing the Kiso to defendant Orion Shipping Co., Ltd. ("Orion"), a Japanese corporation.

The gist of the plaintiffs' allegations is that plaintiffs were subject to a pervasive pattern of abuse by the owners, officers, and managers of the Kiso, including the underpayment of wages. The parties now bring cross-motions regarding class-certification and for summary judgment. Defendants also bring a motion to dismiss paragraph 15 of the complaint and a motion for leave to deposit funds into the Court. The relevant facts are as follows.

### A. Plaintiffs' Contracts At The Time Of Boarding.

All of the plaintiffs are members of the Association of Marine Officers' and Seamens' Union of the Philippines (AMOSUP), which is the Philippine national affiliate of the International Transport Workers' Federation (ITF). In the fall of 1989, plaintiffs were hired in the Philippines through a Filipino vessel manning agency, Trans–Phil Marine Enterprises ("Trans–Phil"). At the time they were hired, the plaintiffs signed a number of documents.

First, plaintiffs executed two contracts at the office of Trans–Phil. One of these contracts was a form prescribed by the Philippine Overseas Employment Administration (POEA), a government agency which regulates the employment of Philippine seamen on foreign vessels. The other contract was a form prescribed by AMOSUP. Defendants caused these contracts to be processed in accordance with Philippine law, and the POEA issued an Overseas Employment Certificate (OEC).

The two contracts, and the resulting OEC all adopted the wage rates and terms of the 1989 AMOSUP Collective Bargaining Agreement (the "1989 CBA"). On the basis of the two signed contracts and the OEC, Trans–Phil issued each plaintiff "Embarkation Orders" in an envelope. It is undisputed that the Embarkation Orders contained terms which were different, and less favorable to plaintiffs than the 1989 CBA. Plaintiffs' state in their declarations, however, that the envelopes containing the Embarkation Orders were sealed, and that they had no knowledge of the contents of the Orders. Defendants deny that the envelopes were sealed, but have come forward with no evidence that plaintiffs knew the terms of the Embarkation Orders at the time they were issued.

With their OEC and Embarkation Orders in hand, plaintiffs left Manilla and boarded the Kiso. Upon boarding the Kiso, plaintiffs signed shipboard articles. These articles also described the wages and working conditions applicable to plaintiffs, and adopted the wage rates and provisions of the 1989 CBA.

### B. Critical Contract Terms.

The terms governing compensation to plaintiffs for their service aboard the Kiso are critical to the present motions and have been heavily briefed by the parties. Most relevant are the terms of the 1989 CBA identifying the wage components, and governing the resolution of wage disputes.

The 1989 CBA identifies six wage components which are relevant to the present proceedings. First, the 1989 sets the base

references to "the complaint," or "plaintiffs' complaint," are to the December 3, 1990, amended complaint.

wage rate for able bodied seamen at $821.00 per month. Each seamen does not receive a wage of $821.00 per month, rather this rate establishes a benchmark from which each seamen's wage is calculated based on his particular position, seniority, etc. Plaintiffs' Embarkation Orders called for a base rate of $400.00 per month.

Second, Article IX of the 1989 CBA provides for vacation pay accumulated at the rate of six days wages for every month of employment. Third, Article VII of the 1989 CBA, and Appendix A attached at the back, set working hours and provide for overtime pay for work outside of normal working hours.

Fourth, Article III obligates the operator of the Kiso to "furnish transportation ... from the port/seaport of Manila to the port of employment and return[,] and to give [covered seamen] a per diem [while in transport] of U.S. $7.00 per day per licensed crewmember and U.S. $3.00 per non-licensed crewmember...."

Fifth, Article XI provides for a monthly longevity wage bonus for seamen who have worked continuously on Trans–Phil contracts for two or more years. Finally, Article XXV provides that seamen who are not taken aboard the Kiso, but are placed on "standby" in Manila or a foreign port shall be paid fifty percent of their basic monthly wage for the period during which they are on standby.

In addition to the above terms setting the rate of compensation, the 1989 CBA establishes grievance arbitration procedures covering disputes under the contract. The two contracts signed at Trans–Phil also set the term of employment at ten months.

### C. Conduct Aboard Ship.

For the purposes of this motion, it is undisputed that plaintiffs were paid the lower wage stated in their Embarkation Orders, not the wage rate uniformly called for by the 1989 CBA, the two Trans–Phil contracts, the OEC, and the shipboard articles. It is also undisputed that the in furtherance of defendants' decision to pay the lower rate, the officers and managers of the Kiso maintained two sets of books. At the end of each pay period plaintiffs executed two receipts, one real receipt showing payments based on a base pay rate of $400.00 per month, and one false receipt showing payments based on the rate of $821.00 per month as called for in the 1989 CBA. The receipts were then recorded in separate books. Plaintiffs allege that this practice of "double booking" is widely employed by defendant NYK, which owns many vessels.

Defendants note that plaintiffs cooperated in this double booking arrangement, and never complained or requested the higher wage. Plaintiffs assert that their cooperation was the result of economic duress. In particular, plaintiffs assert that the officers of the Kiso told plaintiffs that if they did not cooperate they would be blacklisted in the Philippines and would not work again. In support of this allegation, plaintiffs have filed a memorandum allegedly circulated by defendants after the arrest of the Kiso in San Francisco. The memorandum is entitled "WATCHLIST" and was circulated to manning agencies in Manila. The memorandum identifies nineteen seamen, all plaintiffs in this action, and explains that all "have been dismissed/repatriated for *ITF INVOLVEMENT WHILE ONBOARD M/S KISO.*" (Emphasis original). Defendants deny drafting or circulating this memorandum.

The 1989 CBA expired on April 9, 1990. Prior to this date, NYK entered into negotiations with AMOSUP. These negotiations resulted in an new Collective Bargaining Agreement (the "1990 CBA") which became affective on April 9, 1990. The 1990 CBA deviated from the terms of the standard ITF contract, and lowered the base pay rate for AMOSUP members to $360.00 per month.

However, the 1990 CBA also included a so-called savings clause which provides that "any seafarer enjoying terms and conditions which are taken as a whole, recognized by the ITF as more favorable to the seafarer, shall continue to enjoy such terms and conditions" under the 1990 CBA. Documents submitted by defendants indicate that AMOSUP agreed to the lower pay rate

in the 1990 CBA "on the grounds that the previous agreements [ie. the 1989 CBA] were completed in full and the crewmembers concerned were signed off."[2] It is undisputed that plaintiffs' ten month term of employment was not completed in full, and that plaintiffs were not signed off, in April of 1990.

The 1990 CBA also substantially reiterates the grievance and arbitration rules of the 1989 CBA.

On April 9, 1990, the Kiso was at sea. Nonetheless, on that day defendants presented plaintiffs with new shipboard articles and asked each plaintiff to re-sign. The wage provisions of the articles were blank at the time of signing. The blanks were later filled in by officers of the Kiso to state the lower pay rate established by the 1990 CBA.

Plaintiffs state at the time they signed the new articles they did not know the terms of the 1990 CBA. Defendants do not concede plaintiffs knowledge or lack of knowledge. However, defendants have submitted no evidence indicating that plaintiffs knew of the 1990 CBA or its lower wage terms.

### D. The First Attempted Arrest Of The Kiso And The Japanese Arbitration.

On July 12, 1990, the Kiso docked in Los Angeles, California. While on shore, certain plaintiffs contacted Sidney Kalban, a New York attorney, informed him that they were being underpaid through a double booking scheme, and asked him to represent them.

On Saturday, July 14, the Kiso sailed from Los Angeles to Oakland, California. Sydney Kalban had arranged for the vessel to be met by local counsel and a representative of the ITF named Anthony Sasso ("Sasso"). Sasso and local counsel determined that double booking was being practiced. Sasso reported this practice to the ITF, and local counsel initiated an attempt to arrest the Kiso by filing suit and seeking a court order arresting the vessel. The

Kiso, however, sailed for Japan on Monday, July 16, 1990 at 5:00 a.m., and a court order could not issue while the Kiso remained in port.

In addition to arranging for an attempted ship arrest, Kalban contacted the head office of the ITF in London and requested a union investigation of double booking on the Kiso. This report was in addition to the report which the ITF had already received from Sasso. Plaintiffs state that they did not specifically authorize or request Kalban to initiate an extended Union investigation or a Union grievance proceeding. While the record is not entirely clear, a formal Union investigation apparently went forward through the ITF's Japanese affiliate, the Japan Seamen's Union (JSU). The Japanese officers of the Kiso are members of the JSU, and played some role in the investigation.

The union investigation confirmed that double booking was occurring. The JSU then invoked the grievance provisions set out in both the 1989 and 1990 CBA's. The JSU contacted Orion and attempted to negotiate the payment of full wages. Specifically, Takemi Nakao of the JSU contacted Captain H. Kawasaki of Orion, and demanded payment to plaintiffs of money that would conform their compensation to the base rate of $821.00 per month. Nakao and Kawasaki eventually reached a negotiated agreement. Nakao and Kawasaki's negotiations, and the resultant agreement, are hereinafter referred to as the Japanese Arbitration.

The record regarding the terms of this agreement is not entirely clear. However, it appears that Nakao and Kawasaki's agreed that all plaintiffs would receive payments raising their compensation to the level required by a base rate of $821.00 through the date of the negotiated agreement. Plaintiffs' shipboard payments would thereafter be made at the lower base rate of the 1990 CBA. However, whenever the Kiso docked in Japan, plaintiffs would have a right to supplemental payments

---

**2.** Declaration of Frederick Wentker, Jr. re: Crew Grievance in Support of M/S Kiso Motion for Summary Judgment, "Exhibit C" (first attachment).

which would raise their pay to the rate required by a base rate of $821.00.

It is undisputed that the negotiations between JSU and Orion occurred without the knowledge or participation of the plaintiffs, who were at sea and proceeding toward Japan while the negotiations went forward. It is also undisputed that plaintiffs never specifically requested such negotiations. However, upon the arrival of the Kiso in Japan, the JSU and Orion held a meetings with plaintiffs at which the terms negotiated by Nakao and Takemi were described.

### E. Wage Payments Subsequent To The Japanese Arbitration.

Following the Japanese Arbitration, defendants began a series of supplemental payments to plaintiffs designed to bring their wages in accord with the base rate of $821.00 set out in the 1989 CBA. These payments were based on recalculation of plaintiffs base monthly salary and overtime pay. These supplemental payments did not include any recalculation or payment of longevity pay, standby pay, or transportation pay.

Specifically, on July 27, 1990, sixteen plaintiffs received payments designed to bring their pay rate for the period from April 9, 1990, through July 27, 1990, into line with a base wage rate of $821.00 per month. On August 6, 1990, the same sixteen plaintiffs received similar payments covering the period from the date of their engagement through April 8, 1990. At the time they accepted payments, these plaintiffs signed receipts stating that the payments were "in full compliance with and satisfaction of the Articles and CLAUSES OF ITF AMOSUP Collective Agreement." Plaintiffs have all testified at deposition that at the time they accepted these payments, they did not believe that these payments fully satisfied their wage claims, and that they were entitled to more money under their employment contracts.

Following these payments the Kiso returned to its usual course, and sailed for the U.S. It is undisputed that once back onboard the Kiso plaintiffs were again paid at the lower base rate of $400.00 per month. Defendants assert that this was in line with the Japanese Arbitration, which allowed low pay while at sea, but required special compensatory payments to plaintiffs every time the ship returned to Japan. Plaintiffs deny knowledge of this special payment arrangement.

### F. The Successful Arrest Of The Kiso And Plaintiffs Repatriation To The Philippines.

The Kiso completed its traverse of the Pacific Ocean in roughly ten days, and arrived in Oakland in mid-August of 1990. Upon its arrival, plaintiffs again contacted counsel and complained of being underpaid. On or about August 19, 1990, plaintiffs counsel again attempted to arrest the Kiso. This effort was successful and the Kiso was allowed to sail two days later following the posting of a five million dollar bond by defendants.

Also on August 19, 1990, ITF representative Anthony Sasso again boarded the Kiso and met with the Kiso's crew. Following a private discussion, Sasso informed Captain Ushida of the Kiso that he would be leading plaintiffs off the Kiso to meet with their attorneys ashore. Plaintiffs assert that Sasso then made a wage demand, and informed Captain Ushida that plaintiffs would return to work if they immediately received compensatory pay covering all back wages. Defendants assert that Sasso made no wage demand, and merely informed Captain Ushida that plaintiffs would be leaving the ship.

At some point subsequent their departure from the Kiso, eighteen [3] of the plaintiffs informed Captain Ushida that they would not be returning to work, and that they wished to be paid off and repatriated. On August 21, 1990, these eighteen plaintiffs received payments based on a base wage of $821.00 per month covering salary and overtime pay. The August 21 payment.

---

**3.** All of the plaintiffs except Salvador Ocampo, who was discharged in Tokyo, and Diosdado Mateo, who left the ship in July, 1990, in Los Angeles.

did not include vacation, longevity, standby, or transportation pay.

On August 23, 1990 plaintiffs were repatriated to the Philippines. Defendants assert that they were prepared to make a final payment covering remaining vacation pay owed immediately upon plaintiffs arrival in Manilla, but that defendants did not contact plaintiffs at the request of plaintiffs counsel. In any event it is undisputed that plaintiffs did not receive their final payment of vacation pay until mid-October of 1990, when plaintiffs went into the offices Trans–Phil in Manilla.

### G. The Procedural Posture Of The Present Motions.

Plaintiffs filed this action on August 17, 1990. In this action plaintiffs claim, among other things, that they have not received the wages they are owed in full. The shortfall arises in part because plaintiffs use different formula for calculating certain wage components, such as base salary and overtime, and in part because plaintiffs claim defendants have categorically failed to make any payments regarding other wage components, including longevity and transportation pay.

The parties now bring various motions for resolution by the Court. First, defendants have moved to strike plaintiffs' class action allegations, and plaintiffs have cross-moved for class certification under Federal Rule of Civil Procedure[4] 23. Second, plaintiffs and defendants cross-move for summary judgment. Finally, defendants have moved for leave to deposit funds equal to plaintiffs' wage claim with the Court. These motions are discussed in order below.

## II. CLASS CERTIFICATION.

### A. The Requirements Of Rule 23 And The Applicable Standard Of Review.

Class certification is governed by Rule 23, which provides a two step procedure. First, subsection (a) of Rule 23 sets out four conjunctive requirements which must be met in all class actions: "(1) the class [must be] so numerous that joinder of all members is impracticable, (2) there [must be] questions of law or fact common to the class, (3) the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class, and (4) the representative parties [must] fairly and adequately protect the interests of the class." Rule 23(a).

Second, if all the requirements of Rule 23(a) are met, then the party seeking certification must also show that they have met one of the four disjunctive tests set out in Rule 23(b). Thus, to certify a class the Court must find *either:*

(1) That common questions of law or fact predominate and that a class action is superior to other available methods of adjudication, Rule 23(b)(3); *or*

(2) that the defendant acted or refused to act on grounds generally applicable to the class, rendering declaratory or injunctive relief appropriate with respect to the class as a whole, Rule 23(b)(2); *or*

(3) that the prosecution of individual actions would create a risk of inconsistent verdicts which would establish incompatible standards of conduct for defendant, Rule 23(b)(1)(A); *or finally*

(4) that adjudication of individual claims would be dispositive of the claims or non-party class members, or substantially impede the ability of non-party class members to pursue their own claims. Rule 23(b)(1)(B).

Upon a motion for certification or denial of certification, the proponent of the class bears the burden of establishing that the requirements of Rule 23 are met. *In re Northern District of California Dalkon Shield IUD Products Liability Litigation,* 693 F.2d 847, 854 (9th Cir.1982); *Computer Memories Securities Litigation,* 111 F.R.D. 675, 684 (N.D.Cal.1986). The failure, in this case, of plaintiffs to carry their burden as to any one of the requirements of Rule 23 precludes the maintenance of the lawsuit as a class ac-

**4.** Hereinafter, the "Rules" or the "Rule."

tion. *Rutledge v. Electric Hose & Rubber Co.*, 511 F.2d 668, 673 (9th Cir.1975).

■ In determining whether plaintiffs have carried their burden, the Court may not consider the merits of plaintiffs claims. *In re Unioil Securities Litigation*, 107 F.R.D. 615, 618 (1985). Instead, "[t]he court is bound to take the substantive allegations of the complaint as true, thus necessarily making the class order speculative in the sense that plaintiff may be altogether unable to prove his allegations." *Blackie v. Barrack*, 524 F.2d 891, 901 n. 17 (9th Cir.1975).

However, the Court's obligation to accept plaintiffs' substantive allegations as true does not mean that the Court must accept conclusory or generic allegations regarding the suitability of the litigation for resolution through class action. *Morrison v. Booth*, 763 F.2d 1366 (11th Cir.1985) (rejecting certification in the absence of factually specific allegations). Before ordering that a lawsuit may proceed as a class action, the trial court must rigorously analyze whether the class action allegations meet the requirements of Rule 23. *General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 160, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982).

### B. The Present Motions.

In paragraph 7 of the complaint, plaintiffs allege a two-pronged class definition: "The members of the class represented by named plaintiffs are [1] all seamen who had wages wrongfully withheld and were subject to the same type of conduct" alleged elsewhere in the complaint, *and* [2] "were all seamen who served aboard the M/S Kiso or other vessels owned, operated, and managed by defendant Nippon Yusen Kaisha Ship Management Co., Ltd. within the past five (5) years of the filing of this Complaint." (Emphasis and enumeration added).

In their motion, defendants attack the certification of this class on the grounds that plaintiffs have failed to allege facts sufficient to establish the fourth element of Rule 23(a), *i.e.* adequacy of representation, or any of the tests set out in Rule 23(b).

Plaintiff cross-moves for certification arguing, in essence, that defendants objections are not meritorious, and in the absence of meritorious objections the class should be certified. In what follows, each of defendants' objections are addressed in turn.

### 1. Adequacy Of Representation Under Rule 23(a).

■ This prerequisite to a class action embodies two concerns: that the representatives and their attorneys will competently, responsibly and vigorously prosecute the suit, and that the relationship of the representative parties' interests to those of the class are such that there is not likely to be divergence in viewpoint or goals in the conduct of the suit. *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 449 (3rd Cir.1977). Defendants challenge the adequacy of representation here on three grounds.

■ First, defendants argue that the complaint contains no allegations and attaches no declarations establishing the competence of plaintiffs counsel. This argument is without merit. Absent a basis for questioning the competence of counsel, the named plaintiffs' choice of counsel will not be disturbed, and plaintiffs' bear no affirmative burden to allege facts establishing the competence of counsel in the complaint. *Wehner v. Syntex Corp.*, 117 F.R.D. 641 (N.D.Cal.1987) ("It is presumed plaintiffs' counsel is competent to litigate this case...."). Furthermore, the record in this case establishes counsel's competence. In fact, *defendants'* pleadings—outside the context of certification—have made repeated reference to the fact that plaintiffs' counsel is experienced in both maritime law generally, and in the representation of plaintiff seamen in wage suits specifically.

■ In a second argument, defendants posit that plaintiffs carry the burden to affirmatively allege the absence of any conflict of interest between the named plaintiffs and absent members of the putative class. Because plaintiffs have not so alleged, defendants conclude, certification must be denied.

This second argument is also unavailing. Contrary to defendants suggestion, Rule 23 does not require that plaintiffs affirmatively allege the absence of any conflict between the class representatives and absent class members. Indeed, a class may be certified under Rule 23 where some conflict exists, and conflict will only bar certification where the conflict is serious and irreconcilable. *Sosna v. Iowa,* 419 U.S. 393, 403, 95 S.Ct. 553, 559, 42 L.Ed.2d 532 (1975). Thus, plaintiffs' failure to affirmatively allege the absence of conflict does not bar certification.

■ Finally, defendants argue that a conflict exists between the named plaintiffs and the absent class members because most of the named plaintiffs accepted a settlement of their wage claims through the Japanese Arbitration. Hence, the argument continues, the named plaintiffs will not vigorously pursue their claims here.

This third argument is also unpersuasive. As an initial matter, the validity and effect of the Japanese Arbitration are disputed questions of fact that go to the merits of plaintiffs' claims. At this phase, the Court must accept as true plaintiffs' allegations that their current claims are not foreclosed by the Japanese Arbitration, and allow decertification if later proof undermines these allegations. *Blackie v. Barrack,* 524 F.2d 891, 901 n. 17 (9th Cir.1975). Equally important, even if certain plaintiffs' claims were settled in the Japanese Arbitration, there is no practical reason for assuming that this settlement creates the kind of conflict that would bar certification under Rule 23. If a plaintiffs' claim has been settled, then that plaintiffs claim may be barred here and the plaintiff might be dismissed from the suit. Absent dismissal, however, the fact that plaintiffs have previously accepted a payment from defendants does not impair the named plaintiffs incentive or ability to pursue their remaining wage claim to the fullest extent.

For the reasons discussed above, the complaint sufficiently alleges facts establishing that plaintiffs will adequately represent the absent class members here. Defendants' motion to deny certification under Rule 23(a) should be denied.

*2. Compliance With Rule 23(b).*

It is undisputed that plaintiffs suit should not be certified under Rule 23(b)(2), which deals with class injunctions or declaratory relief. However, plaintiffs assert— and defendants deny—that the class should be certified under Rules 23(b)(1) and 23(b)(3).

*a. Rule 23(b)(1).*

■ With respect to Rule 23(b)(1) defendants view opposing certification is the better view. "In essence, [Rule 23] (b)(1)(A) and (b)(1)(B) are opposite sides of the same coin—a coin which determines suitability for class action by reference to either the awkwardness, irrationality, or the probability of severe prejudice, of separate actions." *La Mar v. H & B Novelty & Loan Company,* 489 F.2d 461, 467 (9th Cir.1973).

Appellate Circuits nationally vary widely on the nature and degree of prejudice required to bring an action within the terms of Rule 23(b)(1). *See, Hernandez v. M/V Skyward,* 61 F.R.D. 558, 561 (S.D.Fla.1973) (discussing conflicting Circuits and commentators). In the Ninth Circuit, however, there is little room for variation. Adopting an extremely conservative view, the Ninth Circuit has held that certification under Rule 23(b)(1) is only appropriate where either: (1) rulings in separate actions would subject defendant to incompatible judgments requiring inconsistent conduct to comply with the judgment; or (2) a ruling in the first of a series of separate actions will "inescapably alter the substance of the rights of others having similar claims." *McDonnell Douglas Corp. v. U.S. District Court, Central District of California,* 523 F.2d 1083, 1086 (9th Cir.1975) *citing La Mar v. H & B Novelty & Loan Company,* 489 F.2d 461, 467 (9th Cir.1973).

In adopting this conservative interpretation of Rule 23(b)(1) the Ninth Circuit has expressly noted that where plaintiffs' claims are for damages, there is no possibility of judgments posing inconsistent standards. *McDonnell,* 523 F.2d at 1086. "By paying the first judgment, defendants

could act consistently with" a later inconsistent judgment denying damages. *Id.* Additionally, the Ninth Circuit has explained that the *stare decisis* affect of a ruling in an early action is insufficient to "inescapably bind" later courts or other members of the putative class. *La Mar,* 489 F.2d at 466–67. To "inescapably bind" members of the putative class the ruling in the first suit must present the substantial possibility of exhausting the funds available to a defendant to pay later claims, or, actually bind absent members of the putative class through principles of *res judicata.*

The present case does not meet the requirements for certification under Rule 23(b)(1) under the conservative Ninth Circuit interpretation of that Rule. Plaintiffs only seek damages. Hence, there is no possibility that separate actions by members of the putative class would lead to incompatible judgments that would require inconsistent conduct by defendants.

Similarly, each plaintiffs claim for breach of contract, fraud, and related torts, relies on defendants' alleged separate promises and misrepresentations to each member of the putative plaintiff class. While these alleged promises and misrepresentations are substantially similar, there is little chance that a ruling with regard to the named plaintiffs will bind putative members of the plaintiff class through *res judicata* principles.

Finally, there is no basis for the application of the limited fund concept at the present time. Defendants' five million dollar bond is admittedly finite, but plaintiffs have made no substantial showing, either through allegations or an evidentiary submission, that there is a substantial likelihood that this limited fund will be exhausted by the claims properly directed against this fund. Plaintiffs correctly note that damage awards in other wage claim suits by seamen against shipowners have risen into the tens of millions of dollars. *See e.g., Raby v. M/V Pine Forest,* 918 F.2d 80 (9th Cir.1990) (awarding roughly $32,000,000.00). Unfortunately, this Court's rulings must be based on the record in this case, and that record is insufficient to support certification under Rule 23(b)(1).

### b. Rule 23(b)(3).

To certify a class under Rule 23(b)(3), the Court must find that common questions of law or fact predominate over questions affecting only individual members of the putative class, *and,* that a class action is superior to other available methods for the fair efficient adjudication of the controversy. *In re Northern District of California, Dalkon Shield Litigation,* 693 F.2d 847, 855 (9th Cir.1982). Once again defendants' view that the Court cannot make these two findings here is the better one.

As the class is now defined, common questions of law and fact do not predominate over questions that must be resolved separately for individual members of the putative class. The current class definition defines the class as, among other things, all seamen "who had wages wrongfully withheld and were subject to the same type of conduct" alleged "hereinafter" in the complaint. Complaint at ¶ 7. This definition is radically overbroad: The "type" of misconduct alleged "hereinafter" includes breach of contract, fraud, and unlawful withholding of wages. Indeed, under this definition, the class is so broad as to be unascertainable, and, on that basis alone, un-certifiable. *Bailey v. Patterson,* 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962).

Moreover, there are two reasons for believing that the defects in plaintiffs class definition cannot be cured through amendment. First, individual issues of fact predominate over common issues of fact. Admittedly, classes are routinely certified in fraud and breach of contract actions where the misconduct alleged takes the form of a standardized business procedure or a standardized misrepresentation (typically through a uniform writing) by a common defendant. *Lerwill v. Inflight Motion Pictures, Inc.,* 582 F.2d 507 (9th Cir.1978); *Blackie v. Barrack,* 524 F.2d 891, 903 (9th Cir.1975).[5]

5. *See also, McClendon v. Continental Group, Inc.,* 113 F.R.D. 39 (D.N.J.1986) (certifying na-

Here, however, plaintiffs wage and fraud claims arise from a complex course of conduct involving multiple defendants and a series of different alleged promises and misrepresentations. For example, plaintiffs wage and fraud claims raise questions of fact requiring the analysis of: (1) an employment contract negotiated by Trans-Phil; (2) shipping articles allegedly altered by the Officers of the Kiso; (3) the new shipping articles signed at sea on April 9, 1990; (4) the effect of the 1990 CBA; (5) the effect of the Japanese Arbitration; (6) each individuals unique damages. Even if defendants routinely engaged in double booking, there is no allegation that defendants routinely attempted to renegotiate shipping articles at sea, or subject wage claims to overseas union arbitration.

■ Second, even if common issues predominated here, the class sought by plaintiffs is not manageable, and a class action would not be a superior format for resolving the claims of the members of the proposed class. *In re Hotel Telephone Charges*, 500 F.2d 86, 89–90 (9th Cir.1974); *see In re Northern District of California, Dalkon Shield Litigation*, 693 F.2d 847, 855 (9th Cir.1982). The proposed class is comprised of hundreds of seamen who are foreign nationals, and who are probably traveling throughout the world pursuing their trade. It will be difficult, if not impossible, to provide class members appropriate notices or otherwise communicate with the class. This communication difficulty is fatal where, as here, each plaintiff has a unique claim for damages and some level of discovery will be necessary with regard to every member of the plaintiff class.[6]

### C. Conclusion.

For the reasons discussed above, defendants motion to dismiss plaintiffs class allegations without leave to amend will be granted and plaintiffs related cross-motion for class certification will be denied.

### III. SUMMARY JUDGMENT.

The parties' cross-motions for summary judgment are complex. However, read together the motions turn on three issues: (1) What are the wage terms of plaintiffs' employment contract? (2) Are plaintiffs' claims for back wages barred by the resolution of these claims through grievance procedures under the CBA's? And (3), if plaintiffs' claims are not barred, have plaintiffs established causes of action under 46 U.S.C. § 10313, which regulates the payment of wages to seamen?

After discussing the standard of review applicable to cross-motions for summary judgment, each of these issues will be reviewed in turn.

### A. The Applicable Standard Of Review.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to a judgment as a matter of law."

■ Under modern rules, the weight of the burden upon summary judgment is determined with reference to the burden of proof at trial. "If the party moving for summary judgment [does not bear he bur-

---

tional employee class in suit based on employer business practice uniformly followed nationally); *Ventura v. New York City Health and Hospitals Corp.*, 125 F.R.D. 595 (S.D.N.Y.1989) (certifying employee class to challenge employer's employee drug testing program); *Levya v. Buley*, 125 F.R.D. 512 (E.D.Wash.1989) (certifying class of employee farm laborers to bring breach of contract and unlawful withholding of wage claims against common employer).

**6.** The need to take discovery with regard to each class member distinguishes this case from other cases involving migrant workers where notice requirements could be fulfilled by posting notices at trade or union halls, or by the publication of notices in trade newsletters or journals. *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301 (9th Cir.1990); *Calderon v. Presidio Valley Farmers Ass'n*, 863 F.2d 384 (5th Cir.1989); *Montelongo v. Meese*, 803 F.2d 1341 (5th Cir.1986); *Haywood v. Barnes*, 109 F.R.D. 568 (E.D.N.C.1986).

den of proof at trial, then after the moving party] meets its initial burden of identifying for the court those ... materials ... [that] demonstrate the absence of any genuine issues of material fact," the burden of production shifts so that "the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, *"specific facts* showing that there is a genuine issue for trial.'" *T.W. Electrical Service, Inc. v. Pacific Elec. Contractors,* 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Kaiser Cement Corp. v. Fischbach & Moore, Inc.,* 793 F.2d 1100, 1103–04 (9th Cir.), *cert. denied,* 479 U.S. 949, 107 S.Ct. 435, 93 L.Ed.2d 384 (1986)) (emphasis in original).

Where the party moving for summary judgment will also bear the burden of proof at trial, then the moving party faces a relatively heavier burden. To succeed here, the moving party must prove each element of the claim or defense upon which judgment is sought by undisputed evidence. *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir.1986) (party with burden "must establish beyond peradventure *all* of the essential elements ..." (emphasis original)). In an influential article, Judge Schwarzer has phrased this burden as follow: "Where the moving party has the burden [of proof at trial ...,] his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465, 487–488 (1984).

Here, plaintiff seamen bear the burden establishing the wage terms of their employment contracts, and of establishing a violation of 46 U.S.C. § 10313. Consequently, to defeat defendants' motion for summary adjudication of these issues the plaintiffs must come forward with substantial evidence raising genuine issues of fact for trial. To succeed on their own motions for summary adjudication of the same issues, plaintiffs must establish these issues "beyond peradventure" by undisputed facts.

Defendants will bear the burden at trial to prove their defense of release or bar arising from the Japanese Arbitration proceedings. As a result, to avoid summary adjudication in favor of plaintiffs' defendants must come forward with substantial evidence raising genuine issues of fact, and to prevail on their own motion defendants must establish release or bar by undisputed facts.

When judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and is required to draw all inferences in a light most favorable to the nonmoving party. *T.W. Electrical,* 809 F.2d at 630–31 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

However, there are limits to the admissibility of evidence offered to support or defeat a motion for summary judgment. Conclusory, speculative testimony is insufficient to raise genuine issues of fact and, thereby, defeat summary judgment. *Thornhill Publishing Co. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir.1979) (businessman's conclusory statement that conduct affected commerce did not defeat summary judgment); *Falls Riverway Realty, Inc. v. Niagra Falls* 754 F.2d 49 (2nd Cir.1985) (conclusory testimony insufficient support for summary judgment); *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572 (7th Cir.1989) (party cannot defeat summary judgment "with an affidavit ... based on rumor or conjecture.")

Thus, even when offered by expert witnesses, conclusory opinions without an identified basis in specific facts cannot prevent summary adjudication. *United States v. Various Slot Machines on Guam,* 658 F.2d 697, 699–701 (9th Cir.1981); *Bulthuis v. Rexall Corp.,* 789 F.2d 1315, 1317–18 (9th Cir.1985).

Finally, a party may not create an issue of fact by submitting an affidavit contradicting earlier sworn testimony. *Ra-*

*dobenko v. Automated Equipment Co.,* 520 F.2d 540 (9th Cir.1975).

### B. The Terms Of The Plaintiffs' Contracts.

■ It is well established that the basic terms of a seamen's employment contract are set out in the shipboard articles signed at the outset of a voyage. *Young v. Steamship Co.,* 105 (15 Otto) U.S. 41, 26 L.Ed. 966 (1882); *Sylvis v. Rouge Steel Co.,* 873 F.2d 122, 125 (6th Cir.1989); 1 M. Norris *The Law of Seamen* (4th ed. 1985) § 6.1 ("The shipping article is the contract of employment between the master and the seamen.")

By requiring that the terms of employment be placed in shipping articles signed at the outset of the voyage, the law protects seamen from "harsh treatment and deception" by the master while seamen are in a position of relatively little power at sea. *Sylvis,* 873 F.2d at 125. Shipping articles signed before a ship has sailed also serve efficiency by minimizing disputes concerning wages and other terms of employment that might disrupt maritime communications. *Id., citing Werling v. The Lud Keefer,* 49 F. 650 (W.D.Pa.) *modified* 51 F. 44 (3rd Cir.1892). The law of the United States requires that American flag vessels execute such articles. 46 U.S.C. § 10302. Such articles commonly adopt the wage terms and other features of collectively bargained agreements negotiated by union's representing seamen. *See e.g., Seafarers International Union of North America, Pacific District v. United States,* 304 F.2d 437, 439 n. 1 (9th Cir.1962).

In this action it is undisputed that at the outset of their service plaintiffs all signed shipboard articles which adopted the terms of AMOSUP's 1989 CBA. Thus, under the established rules just discussed, the 1989 CBA governs plaintiffs' employment relationship with Orion and the other defendants during the term of their employment contract, which was for ten months.

■ Defendants argue that the terms of the 1989 CBA were modified in April of 1990 when the plaintiffs signed new articles while at sea. This argument is entirely without merit. As an initial matter, "[a]dmiralty looks with disfavor on a contract of employment entered into while the ship is at sea." 1 M. Norris *The Law of Seamen* (4th ed. 1985) § 6.4 at 179. Many courts have found articles executed at sea per se invalid as executed under inherently coercive conditions. *Id.* (citations therein). Indeed, United States law expressly provides that for articles to bind seamen on an American flag vessel they must be entered into before the seamen proceeds on the voyage. 46 U.S.C. § 10302(a). These principles bar the Court from enforcing here the articles signed by plaintiffs at sea in April of 1990.

■ Even if the Court ignores these common law principles, it is undisputed that the April 1990 articles were blank when signed at sea by the plaintiffs. Thus, the April 1990 articles lacked essential terms at the time of execution and could not form a binding contract. *See Local 3–7, International Woodworkers of America v. Daw Forest Products Co.,* 833 F.2d 789 (9th Cir.1987).

Finally, even if the Court opts to enforce the April 1990 articles, which adopt the terms of the 1990 CBA, the terms of these articles expressly adopt the "more favorable" terms of the 1989 CBA for all AMOSUP members operating under unexpired employment contracts at the time the April 1990 articles were entered. In fact, documents submitted by the *defendants* indicate that AMOSUP only entered into the less favorable 1990 CBA in reliance on NYK's representation that "previous agreements were completed in full compliance [,] ... the crewmembers concerned were signed off," and no existing employment contracts would be abrogated or modified by the 1990 CBA.[7] Thus, even if the Court enforced the April 1990 articles, the Court would find their terms identical to those signed by the plaintiffs when they boarded the Kiso.

---

7. Declaration of Frederick Wentker, Jr. re: Crew Grievance in Support of M/S Kiso Motion for Summary Judgment, "Exhibit C" (first attachment).

For the reasons just discussed, the Court will grant plaintiffs motion for summary adjudication and find that plaintiffs employment relationship with defendants is governed by the terms of the 1989 CBA.

*C. The Japanese Arbitration.*

 It is well established that a seamen's contractual obligation to arbitrate wage claims cannot abrogate his statutory right to resolve wage claims under the applicable statutory rules in federal court. *U.S. Bulk Carriers, Inc. v. Arguelles,* 400 U.S. 351, 357–58, 91 S.Ct. 409, 412–13, 27 L.Ed.2d 456 (1971); 46 U.S.C. § 10313 (regulating seamens' wages). In enunciating this rule, the Supreme Court explained that this option to proceed in court despite contrary contractual obligations is held by individual seamen, and is not imputed to their union representatives. *Id.,* ("What we decide today has nothing whatsoever to do with grievance claims of the maritime unions against employers or the claims of employers against them...").

 Here, defendants concede the above rule. Citing Second Circuit authority, however, defendants add that once a seamen exercises his option, he is bound by his election and may not, for example, proceed in court on the basis of the same wage claim that has been the subject of binding arbitration. *Suissa v. American Export Lines, Inc.,* 507 F.2d 1343 (1974).

The rule of *Suissa* has not been adopted or rejected by the Ninth Circuit. Nonetheless, plaintiffs do not dispute that this Court should apply *Suissa* here *if* defendants carry their burden to establish the factual predicates required by *Suissa.* To wit: (1) A knowing, voluntary election of arbitration by the plaintiff seamen, and (2) an arbitration proceeding meeting the requirements of the 1989 CBA. Plaintiffs argue that defendants have failed to meet their burden on summary judgment to establish these factual predicates "beyond peradventure" by undisputed evidence.

Plaintiffs' argument is persuasive, at least in part. Defendants have established by undisputed evidence that a grievance proceeding meeting the procedural requirements of the 1989 CBA went forward in Japan. Undisputed declarations filed by Captain H. Kawasaki, of Orion, and Takemi Nakao, of the JSU, establish: (1) that the JSU has authority through contract with AMOSUP to represent AMOSUP members in grievance arbitrations; (2) that on in July of 1990 Nakao telephoned Kawasaki and invoked the grievance arbitration rules of the 1989 and 1990 CBA's; (3) that in conformity with these rules Nakao, as a union representative, and Kawasaki, as a management representative, negotiated a resolution to the wage claim; and (4) payments were subsequently made to plaintiffs in the amounts negotiated by Nakao and Kawasaki.

Defendants, however, have not carried their burden to establish that plaintiffs knowingly and voluntarily agreed relinquish their legal rights to proceed in court, and elected binding arbitration. It is important to note here that defendants burden to establish a knowing and voluntary relinquishment by plaintiffs of their statutory rights is a heavy one:

A seaman's release is never conclusive, except when made knowingly, intentionally, and with a full understanding and appreciation of his action in releasing his rights.... Not only will the courts inquire into information given to the seamen, ... but also the circumstances and, as far as possible, the state of mind of the seaman when he effected the settlement. 1 M. Norris *The Law of Seamen* (4th ed. 1985) § 24 at 673, 665 *citing inter alia Garrett v. Moore–McCormack Co,* 317 U.S. 239 [, 63 S.Ct. 246, 87 L.Ed. 239] (1942).

Court's have refused to uphold seamens' releases where the shipowner or master failed to affirmatively explain to the seamen is advance of the execution of the release the seriousness of the right foregone, even when the failure to inform was in good faith. Norris, § 24 at 668–70, 665 *et seq.*

Defendants have failed to carry this burden in two ways. First, all plaintiffs have filed declarations stating that they never requested or authorized the JSU, or anyone

else, to conduct grievance proceedings on their behalf. Defendants attempt to rebut this testimony by establishing a chain of authorization that links plaintiffs with the Japanese Arbitration. In particular, Nakao of the JSU states that he believed he was proceeding on plaintiffs' behalf, and that contractual arrangements between the JSU and AMOSUP clearly authorize him to proceed on plaintiffs behalf. Indeed, Nakao states that officers of the ITF contacted the JSU on behalf of the plaintiffs. Tracing the chain of authorization, defendants explain that the ITF was contacted by plaintiffs' lawyer Sydney Kalban, and Kalban was contacted by the plaintiffs. Thus, defendants argue that plaintiffs committed a binding election of arbitration through an agent of an agent of an agent.

This argument is not persuasive. Even if the Court found that plaintiffs could elect binding arbitration through such an extended chain of agency, defendants have failed to prove each link of the chain here. There is no evidence that plaintiffs knowingly and voluntarily authorized their attorney to pursue contractual remedies, that or that plaintiffs' counsel authorized the ITF to pursue such remedies. As a result, there is a genuine issue of fact as to whether plaintiffs elected contractual remedies and defendants' motion for summary judgment should be denied.

Defendants have also failed to carry their burden is a second respect. All plaintiffs further declare that at no one ever explained to them that accepting payments negotiated by the JSU would result in the relinquishment of the ability to pursue their statutory wage claims here through legal action. It is important to note that defendants' failure to inform did not occur in a context where plaintiffs' statutory claims in the United States were speculative in scope or unknown to defendants. At the time of the Japanese Arbitration defendants knew that plaintiffs had acquired American counsel, had attempted to initiate a wage suit in the U.S. District Court, and, through the grievance proceed-

ings, knew at least roughly the amount of wages each plaintiffs' wage claim.

In this context, defendants' failure to inform plaintiffs that accepting payments negotiated through the Japanese Arbitration would waive the statutory rights asserted in their suit before this Court raises a genuine issue of fact as to whether any election of contractual remedies by plaintiffs was knowing and voluntary.

For the reasons discussed above, the Court finds that defendants have not established "beyond peradventure" that plaintiffs' claims under section 10313 are barred or released by the Japanese Arbitration. However, defendants' evidentiary showing is not insubstantial, and defendants have come forward with sufficient evidence to raise a genuine issue of fact as to the effect of the Japanese Arbitration. As a result, plaintiffs' cross-motion for summary adjudication that plaintiffs' wage claims are not released or barred by the Japanese Arbitration will also be denied.

### D. Plaintiffs Claim For Wages Under 46 U.S.C. § 10313.

A seamen's right to wages is regulated by, among other things, section 10313 of Title 46 of the United States Code,[8] which provides in relevant part:

(e) After the beginning of the voyage, a seaman is entitled to receive ... on demand, one half of the balance of wages earned and unpaid at each port at which the vessel loads or delivers cargo during the voyage.... If a master does not comply with this subsection, the seaman is released from the agreement and is entitled to payment of all wages earned....

(f) At the end of the voyage, [or upon discharge] the master shall pay each seaman the balance of wages due the seaman

 ....

(g) When payment is not made as provided in subsection (f) of this section without sufficient cause, the master or owner

---

8. Hereinafter, "section 10313."

shall pay to the seaman 2 days' wages for each day payment is delayed.

(i) This section applies to a seaman on a foreign vessel when in a harbor of the United States....

The purpose of section 10313 is "to secure prompt payment of seaman's wages ... and thus to protect them from the harsh consequences of arbitrary and unscrupulous action of their employers, to which, as a class, they are peculiarly exposed." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 572, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982) (Rhenquist, J.) (quoting *Collie v. Fergusson*, 281 U.S. 52, 50 S.Ct. 189, 74 L.Ed. 696 (1930)). In light of this purpose, section 10313 and its predecessors have been liberally construed in favor of seamen. *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 781, 72 S.Ct. 1011, 1014, 96 L.Ed. 1294 (1952) (construing 46 U.S.C. §§ 596 & 597) ("Whenever congressional legislation in aid of seamen has been considered here, since 1872, the Court has emphasized that such legislation is largely remedial and calls for liberal interpretation in favor of seamen.")

Plaintiffs' have brought a claim for wages and wage penalties under section 10313, and defendants have brought a three part motion against this claim. First and second, defendants have moved for summary judgment against eighteen[9] plaintiffs on the grounds that (1) plaintiffs' claims were not brought in good faith, and, (2) plaintiffs were timely paid all wages due to them under the 1989 CBA. Third, with respect to plaintiff Salvador Ocampo, defendants seek summary judgment because Ocampo was not discharged in a U.S. port.[10] These three arguments are addressed in order below.

### 1. Good Faith.

Courts interpreting section 10313 have grafted on to the statutory language an additional requirement that seamen's claims be brought "in good faith." *See e.g., Morewitz v. Andros Compania Maritima S.A.*, 614 F.2d 379, 381 (4th Cir.1980) ("It is well established that wage claims must be asserted in good faith to support a district court's adjudication of such claims.").

The "good faith" requirement is not subject to strict definition. Nonetheless, the requirement weaves together concerns traditionally associated with certain equitable and procedural defenses. For example, in *The Belgier*, 246 F. 966 (S.D.N.Y.1917), Judge Hand relied on the "good faith" requirement to dismiss a claim fabricated by seamen through fraud and trickery. *Id.* at 967–68. Used in this way, the "good faith" requirement embodies concerns traditionally associated with certain equitable defenses, such as unclean hands.

In the case of *Mihalinos v. Liberian S.S. Trikala*, 342 F.Supp. 1237 (S.D.Cal.1972), the court relied on "good faith" to dismiss the claim of a foreign seaman against a foreign shipowner who had few or no contacts with the U.S., and could not, in fairness, be haled into a U.S. court. *Id.* at 1243. In this context, "good faith" embodies fairness concerns commonly argued by way of objections to personal jurisdiction.

Finally, in the recent case of *Castillo v. Spiliada Maritime Corp.*, 740 F.Supp. 409 (E.D.La.1990)[11], the court relied on the "good faith" requirement to dismiss claims brought by seamen after the seamen had expressly sought and received settlement of the same claims in a foreign forum.

---

**9.** All plaintiffs except Salvador Ocampo and Diosdado Mateo.

**10.** In their briefs, defendants argued at length that claims brought by eighteen of the plaintiffs should be subject to summary adjudication because these plaintiffs were neither discharged nor at the end of their voyage when they walked off the ship on August 19, 1990. Under questioning at the hearing, however, defendants conceded this point, and now do not dispute that plaintiffs decision to walk off the Kiso operated

to create a discharge within the meaning of section 10313. Consequently, this issue treated as undisputed and is not analyzed here.

**11.** This case was reversed by *Casitillo v. Spiliada Maritime Corp.*, 937 F.2d 240 (1991) (5th Cir. unpublished opinion). The Court's citation to the district court opinion in *Spiliada* is offered only to illustrate the breadth of the application of the "good faith" doctrine, and not as persuasive or binding authority.

Here, "good faith" incorporates concerns associated with the defense of bar by release, contractual remedies, or *res judicata.*

As the above review makes clear, the "good faith" doctrine is discretionary and turns on the Court's review of the idiosyncratic facts of each case. Moreover, because the "good faith" doctrine embodies principles commonly associated with affirmative defenses, defendants bear the burden of proving "bad faith" that would give rise dismissal of plaintiffs' suit.

 In the present case, defendants repeatedly invoke the "good faith" requirement. However, defendants never clearly delineate the factual basis for the dismissal of plaintiffs' claims based on the absence of "good faith." Defendants do not argue that plaintiffs fraudulently drafted or altered the Kiso's articles, or developed the double booking scheme at issue here. Nor do defendants seriously argue that they or the Kiso had so few contacts with the U.S. that it would be fundamentally unfair to hale defendants into this Court.

Defendants do attempt to analogize this case to *Castillo,* but this analogy is unavailing. For reasons that have been explained at length above, if plaintiffs knowingly and voluntarily elected to pursue settlement of their claims through the Japanese Arbitration, then their claims will be barred without reference to the "good faith" requirement. To the extent plaintiffs did not so elect, then it can hardly be bad faith for plaintiffs to bring their claims here.

Because defendants have failed to carry their burden to show "bad faith" by undisputed evidence, defendants motion for summary judgment based on the "good faith" requirement will be denied.

### 2. *Plaintiff's Wage Claim.*

In a second motion for summary judgment, defendants argue that plaintiffs cannot establish their claims under section 10313 because plaintiffs cannot establish that they were or remain owed wages which have not timely paid. Because plaintiffs carry the burden to establish their wage claim at trial, they bear the burden here to defeat defendants' motion by coming forward with substantial evidence raising a genuine issue of fact as to the failure of defendants to pay plaintiffs their wages in a timely fashion. For the reasons spelled out below, the Court finds that plaintiffs have carried this burden here, albeit in a limited fashion.

(a) The Definition Of "Wage" and "Timeliness."

Before assessing plaintiffs evidence, we should stop to frame the issue presented here more specifically under the applicable definitions of "wages" and "timeliness."

 The Ninth Circuit has defined wages as all "compensation allowed to seamen for their services to the vessel, ... includ[ing] not only base wages specified in the shipping articles, but also overtime, extra wages and bonuses." *Petersen v. Interocean Ships, Inc.,* 823 F.2d 334, 336 (9th Cir.1987) *quoting* 1 M. Norris, *The Law of Seamen,* § 12:1 (4th ed. 1985 at 426). In *Petersen,* the Ninth Circuit went on to discuss approvingly cases from other circuits finding that completion bonuses and travel allowances were wages within the meaning of section 10313. *Id.*

In *Petersen,* however, the Ninth Circuit also held that where compensation is not incident to the performance of service to the vessel, and is not paid at the end of such service, it is not "wages" within the meaning of section 10313. *Id.* at 336–337. For example, "comp time pay" which accrued during service but was paid months after service was completed, and the primary purpose of which was to provide seamen with subsistence income during "slack periods," was held not to be "wages" within the meaning of section 10313. *Id.; Merrick v. Sea–Land Service, Inc.,* 739 F.2d 126, 129 (3rd Cir.1984) (continuous wages, a form of contractual penalty, were not wages because they bore no relation to work performed).

Applying *Petersen* here, five of the six compensation components identified by plaintiffs appear to be wages within the meaning of section 10313. In particular,

base salary, overtime, vacation, longevity, and transportation pay are all wages within the meaning of section 10313. All of these wage components are payable during or immediately following the completion of plaintiffs service. All, with the exception of transportation pay, also accrue incrementally over the period of plaintiffs' actual service to the vessel.

Standby pay, however, is not a "wage" within the Ninth Circuit's interpretation of section 10313. Standby pay is not linked in any fashion to the performance of service to the vessel. Indeed, it is possible for a seamen to accrue standby pay without ever performing any service to the vessel. Standby pay, rather, appears to be compensation designed to aid the seamen during a period when he is not rendering service to the vessel, but during which he needs some means of subsistence. In this respect, standby pay is identical to the "comp time pay" discussed in *Petersen.*

■ For the purposes of plaintiffs' claim under section 10313, timeliness is defined by the terms of the statute: "At the end of the voyage, the master shall pay each seaman the balance of wages due the seamen within 24 hours after the Cargo has been discharged or within 4 days after the seaman is discharged, whichever is earlier." 46 U.S.C. § 10313(f).

It is undisputed that plaintiffs voyage ended no later than August 19, 1990, when plaintiffs walked off the ship and were discharged within the meaning of section 10313. Plaintiffs argue, however, that they had reached the "end of the voyage" much earlier and, as plaintiffs see things, repeatedly. Plaintiffs argue that the "end of the voyage" occurred each and every time the Kiso discharged cargo in the United States. Consequently, plaintiffs conclude, defendants were obligated to pay each plaintiff all accrued wages within 24 hours of every cargo discharge in the U.S., and the Court should direct the parties to

begin calculating statutory wage penalties from the time of each and every cargo discharge in the U.S.

Plaintiffs argument is without merit. Common law and the structure of section 10313 itself establish that the end of the voyage occurs, at the earliest, at the final port of destination. For example, where the vessel's articles specified the term of employment by months for a voyage calling on a number of foreign ports, courts interpreting section 10313's statutory precursors have held that the voyage ended at the final port of destination, and was not terminated by the discharge of cargo at intermediate ports. *The Cubadist*, 252 F. 658 (S.D.Ala.1918) (interpreting 46 U.S.C. §§ 596 & 597, now repealed and replaced with section 10313); *Fitzgerald v. Liberian S/T Chryssi P. Goulandris*, 582 F.2d 312 (4th Cir.1978); *Mavromatis v. United Greek Shipowners Corp.*, 179 F.2d 310 (1st Cir.1949); see *The Annie M. Smull*, D.C.Or., Fed.Cas. No. 423 (1872); *Granon v. Hartshorne*, 1 Blatchf. & H. Adm. 454, 10 F.Cas. 965 (D.C.N.Y.1834) (Fed.Cas. No. 5, 689).

In the same vein, the structure of section 10313 and its precursors recognizes the distinction between the final port of destination and intermediate ports. Section 10313(e) expressly provides for payment of only "one-half of the balance of wages earned and unpaid at *each port* at which the vessel loads or delivers cargo during *the* voyage." (Emphasis added). A seamen's right to demand payment is arises separately under section 10313(f) at "the end of the voyage." A similar distinction is reflected in the statutory structure of repealed sections 596 and 597.[12]

Thus, plaintiffs did not reach the "end of the voyage" ever time cargo was discharged in the U.S., but instead reached the "end of the voyage" when they were discharged from further employment on August 19, 1990.

---

12. The Supreme Court has described the structure established by sections 596 and 597 as follows: "It insures generally a partial payment to [the seamen] of his wages at each port where his vessel loads or delivers cargo. It insures the payment to him of the balance of his wages upon completion of his voyage ..." *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783, 72 S.Ct. 1011, 1015, 96 L.Ed. 1294 (1952).

In sum, the definitions of "wages" and "timeliness" frame the issued presented here as follows: Have plaintiffs come forward with substantial evidence indicating that they did not receive all accrued base salary, overtime, longevity, vacation, and transportation pay before August 23, 1990, or within 24 hours after cargo was discharged in San Francisco, whichever is earlier?

### (b) Plaintiffs Raise A Genuine Issue Of Fact.

In light of plaintiffs evidentiary submission, the Court must conclude that plaintiffs have carried their evidentiary burden to defeat summary adjudication of this issue. It is undisputed that the Kiso had discharged its cargo and, but for the absence of the plaintiffs, would have sailed from San Francisco at 9 p.m. on August 19, 1990. Consequently, to meet the requirements of section 10313, defendants should have paid plaintiffs all accrued salary, overtime, vacation, longevity, and transportation pay no later than 9 p.m. on August 20, 1990.

It is undisputed that defendants did not meet this deadline. Setting aside plaintiffs' challenges to defendants calculation of the amount of wages accrued, it is undisputed that defendants did not make any payment of base salary or overtime until August 21, 1990. It is also undisputed that defendants did not pay vacation pay until October of 1990.

Furthermore, evidence submitted by defendants indicates that five plaintiffs with two or more years of service have never received longevity pay. In particular, plaintiffs have submitted substantial evidence indicating that plaintiffs Escarilla, Bobadilla, Endozo, Carino, Domingo, and Perez, had two or more years experience entitling them to monthly longevity pay. Plaintiffs' Exhibits, May 1, 1991, Exhibit F ("Incentive Allowance" reports). However, none of the balance sheets submitted by defendants show any indication that any plaintiff received longevity pay at any time.

Exhibits In Support of Defendant Kiso's "Final Brief," July 24, 1991, Exhibits A,B,H,I & J.

### (c) Conclusion.

Plaintiffs have come forward with substantial evidence raising a genuine issue of fact as to plaintiffs claims for wages under section 10313. Consequently, defendants' motions for summary judgment regarding this claim will be denied.

### 3. Ocampo's Discharge Outside Of The U.S.

Section 10313(i) limits the application of section 10313 "to seamen on a foreign vessel when in a harbor of the United States." This limitation is drawn from the nearly identical limitation stated in one of section 10313's statutory precursors.[13]

Defendants' argue that section 10313(i) should be narrowly construed to require that before a seamen can bring a wage claim under section 10313(f) the seamen must be discharged, released, or at the end of the voyage, in a U.S. port. As defendants see things, foreign seamen who are discharged, released, or reach the end of their voyage overseas are beyond the reach of section 10313, even where the plaintiff seamen and the defendant master or owner are both otherwise within the personal jurisdiction of the federal courts.

Thus, defendants argue that plaintiff Salvador Ocampo, who was discharged in Tokyo, has no claim under section 10313.

Defendants' argument is not without support, but it not availing in the Ninth Circuit. Nationally, courts at the district and circuit level vary widely on the issue of whether section 10313 requires discharge in the U.S. *Compare, e.g. Cubeiro v. Sun Seaway Enterprises, Inc.,* 539 F.Supp. 1175, 1177 (S.D.N.Y.1982) ("[I]t is ... clear that for the statute to apply, the discharge must have taken place in a United States port."); *Fitzgerald v. Liberian S/T Chryssi Goulandris,* 582 F.2d 312 (4th Cir.1978) ("[T]he district court was incorrect if it

13. "... this section shall apply to seamen on foreign vessels while in harbors of the United States...." 46 U.S.C.A. § 597 (West 1958).

thought that an extraterritorial discharge necessarily precluded the application of American wage statutes.").

The Ninth Circuit, however, has not varied, and has never held that discharge in the U.S. is required to bring a claim under section 10313. In fact, the Ninth Circuit has routinely heard the claims of American seamen discharged in foreign ports whenever the plaintiff seamen and the defendant master or owner were otherwise within the court's jurisdiction. *Escobar v. S.S. Washington Trader*, 640 F.2d 1063 (9th Cir.1981); *Thomas v. S.S. Santa Mercedes*, 572 F.2d 1331 (9th Cir.1978); *see Griffin v. Oceanic Contractors*, 458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982).

In light of the fact that (1) the limitation sought by defendants is not plain on the face of the statute, (2) the Ninth Circuit has never imposed this limitation, and (3) section 10313 must be liberally construed in favor of providing remedies to seamen who have been subjected to the substantive harms regulated by the section, the Court rejects defendants interpretation of section 10313(i). As a result, the Court will deny defendants motion for summary judgment against plaintiff Salvador Ocampo.

### E. Conclusion.

The parties cross-motions for summary judgment ask the Court for rulings regarding the terms of plaintiffs' employment contract, the effect of the Japanese Arbitration, and the ability of plaintiffs to establish a wage claim under section 10313. With regard to plaintiffs' employment contract, the Court finds that the plaintiffs' employment is governed by the terms of the 1989 CBA for the ten month term of their employment.

Additionally, the Court finds that if the plaintiffs knowingly and voluntarily elected to pursue their wage claims through contractual grievance remedies, then they are bound by that election and may not pursue a redundant claim here. However, the Court will deny summary judgment because genuine issues of fact exist as to whether plaintiffs' participation in the Jap-

anese Arbitration constitutes a knowing and voluntary election.

Finally, the Court finds that genuine issues of fact exist that prevent summary adjudication of plaintiffs' wage claim under section 10313.

### IV. DISMISSAL OF CERTAIN FRAUD ALLEGATIONS.

Under Rule 9(b) allegations of fraud must be made with specificity. *Schreiber Distrib. Co. v. Serv–Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986). In particular, allegations of fraud must identify the time, place, and content of the alleged misrepresentation or fraudulent omission, as well as the speaker or document conveying the misrepresentation or omission. *Id.*

In paragraph 15 of the complaint, plaintiffs allege that they were induced by "fraud, deceit and constructive fraud" to sign false wage receipts indicating that plaintiffs were being paid at twice their rate of actual pay. Defendant moves to dismiss paragraph 15 because it alleges fraud without meeting the requirements of Rule 9.

Plaintiffs oppose defendants motion by referring the Court to paragraph 33 of the complaint. In that paragraph plaintiffs allege that at the time they boarded the Kiso they signed shipping articles which represented to plaintiffs that they would be paid at the high rate of the 1989 CBA, which rate was also reflected in the fake wage receipts. Other documents filed by plaintiffs have attached the allegedly fraudulent shipping articles.

Admittedly, paragraph 15 does not expressly incorporate paragraph 33, but instead refers obliquely to allegations "specified hereinafter in this complaint." However, neither efficiency nor fairness is served by dismissing paragraph 15 with leave to amend to incorporate other allegations already in the complaint. Read as a whole, the complaint meets the requirements of Rule 9, and defendants motion to dismiss paragraph 15 will be denied.

## V. DEFENDANTS' MOTION TO DEPOSIT FUNDS.

■ Under 46 U.S.C. § 10313(g), where a ship owner or operator withholds wages from seamen without sufficient cause, "the master or owner shall pay the seamen 2 days' wages for each day payment is delayed." If plaintiff's prevail on their claim for back wages here, then defendants face the possibility that penalties will be imposed upon them under section 10313(g).

In response to this potential liability, defendants seek leave of the Court under Rule 67 to deposit an amount equal to the amount of plaintiffs' wage claim with the Court. The purpose of this deposit is to toll the penalty provisions of § 10313(g).

Defendants' motion will be granted. In the Ninth Circuit it is an abuse of discretion for the trial court to deny defendants the opportunity to toll the penalty provisions of § 10313(g) by depositing an amount equal to the wage claim with the Court. *Raby v. M/V Pine Forest*, 918 F.2d 80, 81 (9th Cir.1990) ("Here we find an abuse of discretion because the district court erred when it failed to allow for the payment of the back wages into the court, an event that would stop the running of penalties.") Moreover, the amount defendants need to deposit in order to toll the penalty is the amount of the underlying wage claim, not the wage claim plus any additional potential penalties. *Id.*, ("We emphasize that penalty wages found to have accrued up to the date of tender of back wages need not themselves be tendered in order to preclude the accrual of further penalties.")

In opposing defendants motion to toll the penalty provisions of § 10313(g) through the deposit of funds, plaintiff challenge the authority of *Raby* in a number of ways. Plaintiffs point out that certain circuits have criticized and rejected the Ninth Circuit rule reflected *Raby*. *Chung, Yong Il v. Overseas Navigation Ltd.*, 774 F.2d 1043 (11th Cir.1985).

Additionally, plaintiffs argue that *Raby* is inconsistent with prior Ninth Circuit rulings, and, therefore, may be considered void or without authority as an improper attempt to overrule Ninth Circuit precedent without an *en banc* hearing. *Nichols v. McCormick*, 929 F.2d 507 (9th Cir.1991). Plaintiffs also note that *Raby* may conflict with the Supreme Court's reasoning in *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982). In an opinion by Justice Rehnquist, the *Griffin* Court ruled that the District Court retained no authority to reduce the amount of the wage penalty by limiting the time period over which the penalty was calculated. *Id.* 458 U.S. at 574–576, 102 S.Ct. at 3252–3253. The Court explained that the wage penalty is punitive, not just compensatory, and noted that the anticipated award on remand of $300,000.00 was not at odds with the statutory purpose of section 10313, even where the wages originally withheld amounted to only $412.00. *Id.*

Finally, plaintiffs argue that the rule reflected in *Raby* eviscerates the penalty provisions of § 10313(g) by allowing defendants to toll these provisions by, in essence, posting a bond. As a practical matter, most shipowners sued in a seamen's wage claim suit post a bond at the outset of litigation to prevent the seamen from arresting the vessel connected with the litigation. In fact, this has occurred here. The penalty provisions of § 10313(g) operate not to give seamen further security in the event of a favorable judgment, but to place financial pressure on ship owners to evaluate and resolve seamen's claims fairly, expeditiously, and without resort to costly litigation. An interpretation of § 10313(g) which allows defendants to avoid penalties by, in essence, posting a small additional security bond, defeats this purpose.

Despite the appeal of plaintiff's arguments, this Court is controlled by the Ninth Circuit's ruling in *Raby*. Defendants' motion to deposit funds will be granted.

## VI. CONCLUSION.

For the reasons set out above, plaintiffs' motion for summary adjudication of the contractual terms governing plaintiffs' employment relationship is GRANTED, and the Court finds that plaintiffs' employment

relationship is governed by the terms of the 1989 CBA.

All remaining motions for summary judgment are DENIED, subject to the terms and findings expressed in the Analysis portion of this Order.

Plaintiffs' motion for class certification is DENIED and defendants' motion for the dismissal of class allegations is GRANTED. Plaintiffs' class allegations are DISMISSED WITHOUT LEAVE TO AMEND.

Defendants' motion to dismiss paragraph 15 of the complaint is DENIED.

Finally, defendants' motion to toll the penalty provisions of section 10313 by depositing funds into the Court is GRANTED.

IT SO ORDERED.

## ON MOTION FOR RECONSIDERATION

On October 23, 1991, the Court heard defendants' motion for reconsideration of portions of the August 13, 1991 Order in this case denying defendants' motion for summary judgment. Frederick W. Wentker, Jr. and Phillip Dalton of Lillick & Charles appeared on behalf of defendants the M/S Kiso and Vesta Co., Ltd.; Marvin Stender, of McTernan, Stender & Walsh, and Richard Dodson appeared on behalf of plaintiffs. For the reasons set forth below, defendants' motion for reconsideration is GRANTED IN PART and DENIED IN PART.

## I. BACKGROUND

The facts and history of this case are complex and are summarized in the Court's August 13, 1991 Order ("August Order"). Briefly, the present motion arises in an action by twenty Filipino seamen working aboard the M/S Kiso (the "Kiso") against the Kiso, *in rem*, and the owners and managers of the Kiso. The Kiso is a Liberian-flagged vessel which carries goods between the United States and Japan. The title owner of the Kiso is defendant Vesta Company, Ltd, ("Vesta") a Liberian corporation. The beneficial owner of the Kiso, however, is a Japanese corporation, defendant Nippon Yusen Kaisha Ship Manage-

ment Corporation ("NYK"). The officers of the Kiso are also Japanese. Vesta contracted the responsibility for managing the Kiso to defendant Orion Shipping Co., Ltd. ("Orion"), a Japanese corporation. Plaintiffs allege that, while employed by defendants, they were subject to a pervasive pattern of abuse, including double-booking practices and non-payment of wages.

The Court heard plaintiffs' and defendants' cross-motions for summary judgment on June 14, 1991. The Court considered three issues in the August Order. First, the Court found that the Association of Marine Officers' and Seamens' Union of the Philippines ("AMOSUP") 1989 Collective Bargaining Agreement ("1989 CBA") governed plaintiffs' employment relationship with defendants; the Court granted summary judgment to plaintiffs on this issue. Second, plaintiffs and defendants also sought summary judgment on the effect of a Japanese arbitration proceeding on plaintiffs' wage claims. The Court held that neither party had sufficiently demonstrated that the Japanese arbitration did or did not bar plaintiffs wage claims, and therefore denied summary judgment to both parties. Finally, defendants moved for summary judgment on plaintiffs' claim under 46 U.S.C. § 10313, because (1) plaintiffs arguments were not made in good faith; (2) plaintiffs were paid in a timely fashion all wages due them under the 1989 CBA; and (3) with respect to plaintiff Salvador Ocampo, because Ocampo was not discharged in a United States port. This motion for summary judgment was also denied.

On September 13, 1991, the Kiso and Vesta (collectively "defendants") filed a motion for reconsideration of the Court's August Order, on grounds that (1) defendants' did not concede that plaintiffs were "discharged" within the meaning of § 10313 and (2) plaintiff Ocampo should have been denied standing because he was a foreign seaman discharged in a foreign country.

## II. ANALYSIS

### A. *The Legal Standard*

 Federal Rule of Civil Procedure 60(b) governs the reconsideration of final

orders. That rule permits the court to relieve a party from a final judgment or order on grounds of

> (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b), (3) fraud ... of an adverse party, ... or (6) any other reason justifying relief from the operation of the judgment.

Rule 60(b) motions apply only to final judgments, however, and not to interlocutory rulings. Nevertheless, district courts are authorized to reconsider interlocutory orders at any time prior to final judgment, independently of Rule 60(b). 11 Wright & Miller, *Federal Practice and Procedure*, § 2852, at 145; *Vaughn v. Regents of University of California*, 504 F.Supp. 1349, 1351 (E.D.Cal.1981). Motions to reconsider are committed to the discretion of the trial court. *Combs v. Nick Garin Trucking Co.*, 825 F.2d 437, 441 (D.C.Cir.1987) (citing cases) (involving motion to reconsider a default judgment). Nevertheless, the Court looks to the standard used in examining a Rule 60(b) motion.

 An order may be reconsidered if the Court made a clear error of law or if the prior order caused a manifest injustice to occur. In order for a party to demonstrate clear error, the moving party's arguments cannot be the same as those made earlier. *Great Hawaiian Fin. Corp. v. Aiu*, 116 F.R.D. 612, 617 (D.Haw.1987) (citations omitted). If a party simply inadvertently failed to raise the arguments earlier, the arguments are deemed waived. *Id.* To succeed on a such a motion to reconsider, a party "must set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision." *Id.* at 616.

**B.** *Application*

**1.** *Defendants' "Discharge" Arguments*

A seaman's right to wages is regulated by, among other things, 46 U.S.C. § 10313.[1] The statute, in part, entitles a seaman to receive on demand, one half of the balance of wages earned and unpaid at each port at which the vessel loads or delivers cargo during the voyage. *Id.* § 10313(e). The statute also requires the ship's master to pay a seaman all remaining wages within a specific period of time after the seaman's discharge, and imposes a penalty upon the master or owner if payment of wages after discharge is delayed. *Id.* § 10313(f)–(g). As noted in the August Order, the purpose of § 10313 is " 'to secure prompt payment of seaman's wages ... and thus to protect them from the harsh consequences of arbitrary and unscrupulous action of their employers, to which, as a class, they are peculiarly exposed.' " *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 570, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982) (Rehnquist, J.) (quoting *Collie v. Fergusson*, 281 U.S. 52, 55, 50 S.Ct. 189, 191, 74 L.Ed. 696 (1930)). In light of this purpose, § 10313 and its predecessors have been liberally construed in favor of seamen. *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 781, 72 S.Ct. 1011, 1014, 96 L.Ed. 1294 (1952) (construing 46 U.S.C. §§ 596 & 597) ("Whenever congressional legislation in aid of seamen has been considered here, since 1872, the Court has emphasized that such legislation is largely remedial and calls for liberal interpretation in favor of seamen").

Defendants argue that the Court made several clear errors of fact and law in the August Order pertaining to its application of § 10313. Specifically, defendants claim that they did not concede at oral argument that plaintiffs were "discharged" within the meaning of § 10313, as the August order states.[2] Rather, defendants assert

---

**1.** The relevant portions of this statute are set forth in full at page 13 of this Order.

**2.** In the August Order, the Court stated:
> In their briefs, defendants argued at length that claims brought by eighteen of the plaintiffs should be subject to summary adjudication because these plaintiffs were neither dis-

charged nor at the end of their voyage when they walked off the ship on August 19, 1990. Under questioning at the hearing, however, defendants conceded this point, and now do not dispute that plaintiffs decision to walk off the Kiso operated to create a discharge within the meaning of section 10313. Consequently,

that they used the term "manufactured discharge" in all briefs and in oral argument to indicate that no true "discharge" had actually occurred. Because plaintiffs did not make a demand for half wages or receive a refusal of this demand at the Oakland port, defendants assert that plaintiffs' departure was unjustified and, therefore, amounted to desertion. As desertion requires a forfeiture of all wage claims, defendants argue that summary judgment in favor of defendants was appropriate as to the wage claims of all twenty defendants.

Defendants have also attached a portion of the deposition of International Transport Workers' Federation ("ITF") representative Anthony Sasso ("Sasso"). They offer this deposition as proof that Sasso never made a wage demand when plaintiffs left the ship, and, therefore, plaintiffs' departure was unjustifiable desertion. Even if Sasso did make a wage demand, defendants argue, the Order states that this demand was for all wages then due, not for half of the wages then due. As plaintiffs never had a right to demand full wages, denial of that demand would not justify plaintiffs' decision to leave the ship, and therefore, plaintiffs were deserters.

Plaintiffs assert that Sasso made a wage demand on their behalf on August 19, 1990, before leading plaintiffs off the ship at Oakland. Plaintiffs also assert that they demanded their wages in their complaint, which was filed with this Court on August 17, 1990, two days before they left the ship. In their first amended complaint, plaintiffs again allege that demands for payment and half-payment were repeatedly made and refused. First Amended Complaint, ¶¶ 16, 17, 20, 23.

The Court agrees with defendants that plaintiffs have not offered evidence to support their claim that they demanded half wages, pursuant to § 10313(e), while in a United States port. This conclusion is based upon further review of the case file,

rather than the arguments of defendants, however.

The wage claims within plaintiffs' first amended complaint are pleaded in very general terms. The complaint states that plaintiffs made a demand "upon defendants ... for their full wages and back pay in accordance with the terms of their contracts and ... [section] 10313(f). The defendants refused each and every such demand for full wages. Named plaintiffs and members of plaintiffs' class also made demand for half wages pursuant to ... [section] 10313(e)." First Amended Complaint, at ¶ 17. Plaintiffs also assert that demands for wages were made while in United States waters. *Id.* at ¶¶ 16, 20. Plaintiffs then state that they, as a group, are seeking both back wages and penalty wages owed them. *Id.* at ¶ 23.

Yet plaintiffs' Statement of Undisputed Facts, filed on May 1, 1991, contradicts the first amended complaint and specifically indicates that such a demand was not made in United States waters.[3] Plaintiffs, in their original complaint and the Statement of Undisputed Facts, instead argue that:

> Plaintiffs made a legally sufficient demand for advances of one-half of their earned wages under 46 U.S.C. § 10313(e) by signing the monthly pay receipts for the wages specified in the shipping articles which were not paid.... While a specific demand for half wages may be necessary in ordinary circumstances, free from fraud, duress, intimidation, or coercion, it would be anomalous to impose that requirement where, as here, a demand would lead to certain discharge and retaliation as promised by Captain Ushida.... [executing the pay receipts] complied with the underlying purposes of [§ 10313(e)'s] demand requirement.

Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment, at 26, n. 12; *see also* Plaintiffs' Statement of Undisputed Facts, at 23.

this issue treated as undisputed and is not analyzed here.
August Order, at 37 n. 10.

**3.** In this document, plaintiffs state that: "[p]laintiffs agree that "no seaman testified he

ever asked for half pay in an United States port." Plaintiffs' Statement of Undisputed Facts, at 23.

Courts have long held that, absent an explicit demand for payment of wages and a denial of that demand, no claim under § 10313(e) or former § 597 can stand. *See Sigalas v. Lido Maritime, Inc.*, 776 F.2d 1512 (11th Cir.1985); *Larkins v. Hudson Waterways Corp.*, 640 F.2d 997 (9th Cir.1981); *Fitzgerald v. Liberian S/T Chryssi P. Goulandris*, 582 F.2d 312 (4th Cir.1978). "The demand must be plainly made so that the master will know exactly what is demanded of him, and since if he refuses the payment of the half wages, all of the wages then become due, it becomes obvious that clarity in the making of the demand is essential." Norris, *The Law of Seamen*, § 17:33.

Although plaintiffs argue that the act of signing pay receipts for wages not received is the functional equivalent of an explicit demand for half wages, this argument is unpersuasive in light of the purpose of § 10313(e). The signing of the receipts for wages not received is not a clearly made demand for half wages sufficient to place the ship's master on notice of plaintiffs' claims. Furthermore, this act could easily be interpreted by the master as acceptance of the double-booking scheme, rather than a demand for the higher pay scale set forth in the 1989 CBA.

The Court is also unwilling to create the exception to the demand requirement suggested by plaintiffs. Plaintiffs have offered no evidence of duress other than the economic duress that may have resulted from the alleged withholding of their wages. As such an economic duress argument could be made by virtually any seaman who has had wages improperly withheld, such an exception would eliminate the demand requirement of § 10313(e) altogether.

Plaintiffs' argument that their complaint constituted a demand for wages under § 10313(e) is equally unpersuasive. First, the complaint does not plainly state that it is a demand for wages under § 10313(e). Rather, the complaint states that demands for wages pursuant to § 10313(e)–(f) had already been made prior to the filing of the complaint. Plaintiff's Complaint, at ¶ 16. As noted above, plaintiffs have failed to offer any evidence to support their claim that such demands were made. Had plaintiffs actually made a demand for wages while in the United States waters, they could have submitted affidavits from the plaintiffs who made the demand, or other supporting evidence to lend credibility to their claim. Second, even if the complaint filed on August 17, 1990 did constitute a statutory wage demand, that complaint was filed on behalf of only three plaintiffs [4] and could not be construed as a wage demand for all twenty of the plaintiffs who are now a part of this action. Because plaintiffs have failed to offer any evidence that a demand for wages was "plainly made," as the law requires, defendants' motion for reconsideration is GRANTED as to all § 10313(e) claims. Defendants' motion for summary judgment is GRANTED as to these claims.

A demand for payment is not necessary to a maintain a claim under § 10313(f)–(g), however. Subsection (f) requires that a seaman receive the balance of wages owing "within 24 hours after the cargo has been discharged or within 4 days after the seaman is discharged, whichever is earlier." § 10313(f). Subsection (g) imposes a penalty upon the master or the owner of the ship if payment of subsection (f) wages is delayed, without sufficient cause. To survive defendants' motion for summary judgment, plaintiffs were required to come forth with substantial evidence raising genuine issues of material fact.

In the August Order, the Court indicated that plaintiffs had met that burden in several ways. Under § 10313(f)–(g), defendants should have paid plaintiffs all accrued salary, including overtime, vacation, longevity, and transportation pay no later

---

**4.** The initial complaint was filed on behalf of plaintiffs Diosdado Mateo, Benjamin Armoge-

than August 20, 1990 at 9 p.m.[5] Defendants admittedly did not pay base salary until one day later or vacation pay until over one month later. The August Order also indicates that plaintiffs submitted "substantial evidence indicating that [a number of] plaintiffs ... had two or more years experience entitling them to monthly longevity pay." August Order, at 45–46. The balance sheets submitted by defendants, however, did not indicate that longevity pay had ever been given to any plaintiff. The Court then held that this evidence was sufficient to allow plaintiffs to survive defendants' motion for summary judgment.

■ The present motion does not undermine the evidence presented to the Court at the summary judgment stage. Furthermore, although defendants argue that plaintiffs deserted the ship and thus forfeited all wage claims, this issue remains a question of fact that may not properly be resolved on a motion for summary judgment.

Desertion is defined as "the abandonment of duty by a seaman by quitting the ship before the end of the engagement [1] without consent, [2] without justification and [3] with the intention of not returning to the ship's service." Norris, *The Law of Seamen*, § 8:7. After a seaman has deserted his ship:

> an entry of this fact must be promptly made in the vessel's official log book. The entry must be signed by the master and witnessed by the mate or one of the crew.... A proper log entry should set forth *all* of the facts of the alleged desertion. If the seaman has taken his clothes with him, it should be so stated; also any statements made by him evidencing an intent to abandon the ship,

the place and hour of desertion, the names and ratings of witnesses, etc. *Id.*, at § 8:4.

Although plaintiffs failed to make a wage demand, the Court can not presently hold that plaintiffs' departure at Oakland lacked justification. First, defendants have conceded that plaintiffs were subject to a double-booking scheme. Second, other evidence suggests that plaintiffs have been denied longevity and overtime pay to which they are entitled. Either of these facts might provide justification for plaintiffs' departure. Finally, in response to plaintiffs' claim that their alleged desertion was not properly logged, defendants assert that such logging was not required unless defendants intended to formally charge plaintiffs with desertion. Defendants' Reply to Opposition to Motion for Reconsideration, at 3. Thus, defendants apparently concede that they did not follow the generally accepted procedures for establishing desertion. Because plaintiffs have offered evidence sufficient to demonstrate that their departure from the ship at Oakland was justified, and as defendants have not offered evidence sufficient to establish that plaintiffs deserted the ship, defendants' motion for reconsideration must be DENIED as to the portion of the August Order pertaining to plaintiffs' § 10313(f)–(g) claims.

### 2. The Applicability of § 10313 to Plaintiff Salvador Ocampo

■ Defendants' other argument addresses the August Order's holding that § 10313 applies to the claims brought by plaintiff Salvador Ocampo ("Ocampo"). While the other plaintiffs in this suit were discharged in Oakland, California, Ocampo

---

nia, and Jesus Baruelo.

**5.** Defendants argue that the Court's statement of the deadline for payment is incorrect. They state that

> This point was neither argued nor briefed to the court ... an agreement was reached between counsel on the afternoon of August 20, 1990 to have plaintiffs' counsel bring the seamen back to the KISO the next morning so that they could collect their gear and be paid at the same time.... The Court's assumption

that KISO 'should have paid' by 9:00 p.m. on August 20, 1990 is both factually and legally incorrect.

Defendant's Memo., at 2–3 n. 2. Even if defendants are correct, however, this would only indicate that plaintiffs' base salary was paid in a timely fashion. A question of fact would still remain as to whether vacation, longevity, or transportation pay were paid in a timely fashion, or were even paid at all.

was not discharged until the ship reached Japan. Defendants assert that "the Ninth Circuit's silence on the subject notwithstanding, granting standing to plaintiffs such as Ocampo contravenes fundamental principles relating to application of United States law." Defendants' Memo., at 6.[6] Defendants argue on the basis of several other circuit court decisions that § 10313 requires discharge of foreign seamen in a United States harbor for the seamen to sue under the statute. Because Ocampo's case involves the activity of a foreign seaman, taking place outside of the United States on a foreign ship operated by a foreign employer, defendants argue that § 10313(i) cannot provide him with a remedy. Furthermore, defendants argue that the Court's holding[7] is "at odds with rules of statutory construction previously and repeatedly observed by the Supreme Court." Defendants' Memo., at 6–7. These Supreme Court decisions, defendants argue, create an overriding presumption against extraterritorial application of United States law.[8]

The Court agrees with defendants that the portion of the August Order pertaining to Ocampo's claims requires reconsideration. Section 10313(i) clearly indicates that it applies "to seamen on a foreign vessel when in a harbor of the United States." The question before this Court, however, is whether the statute applies to a foreign seamen on a foreign vessel who was discharged in a foreign port.

The case law on this subject is, at best, contradictory and confusing. See, e.g., *Fitzgerald v. Liberian S/T Chryssi P. Goulandris*, 582 F.2d 312 (4th Cir.1978) (extraterritorial discharge of Greek seaman would not necessarily preclude applicability of former sections 596, 597, and 599); *Ventiadis v. C.J. Thibodeaux & Co.*, 295 F.Supp. 135 (D.C.Tex.1968) (Greek seaman's discharge outside of United States did not render section inapplicable where seaman signed on in United States port and vessel made regular voyages to and from United States ports); *I Hyeon Su v. M/V Southern Aster*, 767 F.Supp. 205 (D.Or. 1990) (46 U.S.C. § 10313 requires discharge of either cargo or crew in the United States as a prerequisite to foreign seamen's recovery of penalty wages). Discerning the applicable law in the present case is difficult because each of these cases may be distinguished from this action on a variety of grounds. For example, in the *Ventiadis* case, the court held that "to limit [what is now 46 U.S.C. § 10313] only to instances in which the seaman is discharged in a American port would be to unreasonably restrict its effect. In addition, since the beneficial ownership of the ship was in the United States citizens, the suit is between foreign-

---

6. All references to "Defendants' Memo." refer to Defendants' Memorandum in Support of Motion For Reconsideration of Order.

7. In its August Order, the Court stated:
 In light of the fact that (1) the limitation sought by defendants is not plain on the face of the statute, (2) the Ninth Circuit has never imposed this limitation, and (3) section 10313 must be liberally construed in favor of providing remedies to seamen who have been subjected to the substantive harms regulated by the section, the Court rejects defendants interpretation of section 10313(i). As a result, the Court will deny defendants motion for summary judgment against plaintiff Salvador Ocampo.
 August Order, at 48.

8. In *Equal Employment Opportunity Commission v. Arabian American Oil Co.*, — U.S. —, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991), the Supreme Court held that Title VII does not apply extraterritorially to American employers em-

ploying American citizens abroad. In reaching this conclusion, the Court noted that "it is a long-standing principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" — U.S. at —, 111 S.Ct. at 1230 (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 284–85, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949)). This "canon of construction" is necessary to avoid conflict between United States law and the laws of other nations. *Id.* As a result, the Supreme Court held that courts must:

> .... assume that Congress legislates against the backdrop of the presumption against extra-territoriality. Therefore, unless there is 'the affirmative intention of Congress clearly expressed,' we must presume it 'is primarily concerned with domestic conditions.'

*Id.* (quoting *Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138, 147, 77 S.Ct. 699, 704, 1 L.Ed.2d 709 (1957)); *Foley Bros.*, 336 U.S. at 285, 69 S.Ct. at 577.

ers only technically." *Ventiadis*, 295 F.Supp at 137. By comparison, the present case is actually, not technically, between foreigners.

In the *Fitzgerald* case, the statute was found to apply where the plaintiff, ship, contract, employer, and point of discharge were all foreign, but where the plaintiff had boarded the ship in the United States. *Fitzgerald*, 582 F.2d, at 313. Ocampo did not board the Kiso in the United States, however. In *Escobar v. S.S. Washington Trader*, 640 F.2d 1063 (9th Cir.1981), the court applied the statute to a seaman who was discharged in the Philippines. There is no discussion in that case, however, as to the nationality of the plaintiff or the appropriateness of applying the statute to a seaman discharged abroad.

Thus, the best guidance for the Court's decision is § 10313 itself. That statute provides, in relevant part:

> (e) After the beginning of the voyage, a seaman is entitled to receive ... on demand, one half of the balance of wages earned and unpaid at each port at which the vessel loads or delivers cargo during the voyage.... If a master does not comply with this subsection, the seaman is released from the agreement and is entitled to payment of all wages earned....

> (f) At the end of the voyage, [or upon discharge] the master shall pay each seaman the balance of wages due the seaman....

> (g) When payment is not made as provided in subsection (f) of this section without sufficient cause, the master or owner shall pay to the seaman 2 days' wages for each day payment is delayed.

> (i) This section applies to a seaman on a foreign vessel *when in a harbor of the United States*....

46 U.S.C. § 10313 (emphasis added). Subsection (i) indicates that the statute applies to any seaman, whether American or foreign, while in a harbor of the United States. The question for this Court, then, is to determine whether a violation of the statute occurred in a harbor of the United States as to Ocampo.

Under the terms of subsection (e), an actionable claim for one-half back wages is made when a seaman demands the wages and is refused while the ship is in port delivering or loading cargo. Under subsection (f), a claim for the remainder of a seaman's wages arises when a shipowner does not fully pay the seaman at the end of the voyage or upon discharge. Claims under the these subsections are distinct, however, and penalty wages are available only in the event of a violation of subsection (f).

The complaint asserts that Ocampo's subsection (e) right to receive one-half of his back wages was violated while Ocampo was in United States waters. However, this portion of Ocampo's claim fails because, as discussed above, plaintiffs failed to provide evidence that a demand for wages was made. Furthermore, because Ocampo was discharged in Japan, he cannot claim that defendants failed to promptly pay the balance of his wages upon discharge *while Ocampo was in the United States*. As the statute only applies to seamen while they are in a harbor of the United States, subsection (f) of the statute cannot apply to Ocampo. By its own terms, subsection (g) of the statute also cannot apply to Ocampo because the penalty wage provisions only arise in the event of a violation of subsection (f). As a result, defendants' motion for reconsideration is GRANTED as to Ocampo's claims under § 10313(f)-(g). Defendants' motion for summary judgment as to these claims is GRANTED.

## III. CONCLUSION

For the reasons set forth above, the Court makes the following rulings:

1. Defendants' motion for reconsideration of this Court's August 13, 1991 Order is hereby GRANTED where it pertains to the Order's denial of summary judgment as to all plaintiffs' claims under 46 U.S.C. § 10313(e); defendants' motion for summary judgment as to these claims is GRANTED.

2. Defendants' motion for reconsideration of this Court's August 13, 1991 Order is hereby GRANTED where it pertains to Salvador Ocampo's claims under 46 U.S.C. § 10313(f)–(g); defendants' motion for summary judgment as to these claims is GRANTED.

3. Defendants' motion for reconsideration of this Court's August 13, 1991 Order is hereby DENIED where it pertains to the claims of all remaining plaintiffs under 46 U.S.C. § 10313(f)–(g).

IT IS SO ORDERED.